KELLUM, Judge.
Jerry Devane Bryant, an inmate on death row at Holman Correctional Facility; appeals the circuit court’s summary dismissal of his petition .for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In 1998, Bryant was convicted of the murder of Donald Hollis made capital because it was committéd during the course of a kidnapping, see § 13A-5-40(a)(l), Ala. Code 1975, and was sentenced to death. This Court affirmed Bryant’s, conviction and sentence on direct appeal. Bryant v. State, 951 So.2d 702 (Ala.Crim.App.1999). The Alabama. Supreme Court affirmed Bryant’s conviction, but reversed his death sentence, and remanded the case to this Court to remand the ease to the trial court for a new penalty-phase trial. Ex parte Bryant, 951 So.2d 724 (Ala.2002). In accordance with the Supreme Court’s instructions, this Court remanded the case for a new penalty-phase trial. Bryant v. State, 951 So.2d 732 (Ala.Crim.App.2003). After a new penalty-phase trial, Bryant was again sentenced to death, and this Court affirmed his sentence. Id. (opinion on return to remand). The Alabama Supreme Court denied certiorari review, and this Court issued a certificate of judgment on September 29, 2006. The United States Supreme Court subsequently denied certiorari review on April 2, 2007. Bryant v. Alabama, 549 U.S. 1324, 127 S.Ct. 1909, 167 L.Ed.2d 569 (2007).
Bryant timely filed his Rule 32 petition on September 26, 2007, raising numerous claims, including several claims of ineffective assistance of counsel. The State filed an answer and a motion to dismiss Bryant’s petition on January 10, 2008. On February 21, 2008, Bryant filed a “Motion for Discovery of Institutional Files, Records, and Information Necessary to a Fair Rule 32 Evidentiary Hearing,” wherein he requested numerous items. (C. 389.) The circuit court denied the request on February 26, 2008, with a notation on the case-action summary stating “Motion denied. This is postjudgment not pretrial.” (C. 426.) Bryant filed an amended petition on March 21, 2008, in which he reasserted the claims raised in his original petition, expanding oh some of them with additional factual pleadings, and raised ..additional claims as well. ' The State filed an answer and a motion to dismiss the amended petition on May 21, 2008. Bryant filed a response to the State’s answer and motion to dismiss on August 21, 2008, and on October 3, 2008, he filed a motion for reconsideration of his discovery request, which motion’ was denied by the circuit court on October 13, 2008, with a notation on the case-action summary simply stating “Motion to Reconsider Discovery Order denied.” (C. 756.) On October 27, 2008, the circuit court issued an order summarily dismissing all the claims in Bryant’s amended petition[1] on the grounds that the claims were insufficiently pleaded, were meritless oh their face, or were procedur *1098 ally barred. Bryant filed a motion to reconsider on November 21, 2008, which the circuit court denied on December 3, 2008. Bryant filed a notice of appeal on December 4, 2008.
In our original opinion affirming Bryant’s conviction and the death sentence initially imposed, this Court set out the facts of the crime as follows:
“The State’s evidence tended to show the following. On January 27, 1997, Donald Hollis and his cousin Bert Brant-ley drove from Newville to an Auto Zone automobile parts store in Dothan, where Brantley purchased transmission fluid sealer to repair his car. Brantley testified that he and Hollis left Newville in Hollis’s car at approximately 7:00 p.m. After leaving Auto Zone, at about 8:00 p.m., Hollis and Brantley were driving down Wheat Street in Dothan when they heard someone whistle at them. Brant-ley testified that Hollis turned his car around and then stopped, and that Bryant and another man, Ricky Vickers, approached the car. Soon after, Vickers left, and Hollis, Brantley, and Bryant had a conversation. According to Brantley, Bryant asked him and Hollis if they had been drinking, and Hollis said that they had not, but that he would go buy some beer. Bryant told Hollis to get the beer and to come back and pick him up in 30 minutes. After buying the beer, Hollis returned and picked up Bryant, and the three men drove around while Brantley and Bryant drank beer.
“Brantley testified that they drove to his house in Newville, where the three of them went inside, drank beer, and talked. Brantley said that Bryant mentioned doing some drugs, but that Hollis and Brantley told Bryant that they did not do drugs. The three men then left Brantley’s house and drove back to Do-than. After driving around Dothan for a while, Hollis drove Bryant back to the house where they had picked him up. Brantley testified that when they reached the house, Bryant did not get out of the car and that Bryant said he had something he wanted to talk to Hollis about. Hollis asked Bryant what it was, but Bryant did not say anything. Brantley further testified that he said he would turn his head and look out the window while Bryant talked to Hollis. Brantley said that he then heard a gasp, and when he turned back around, Bryant, who was in the backseat, was holding a gun to Hollis’s head. According to Brantley, Bryant said, ‘This is what it’s all about.’ (R. 458.) Bryant told Brantley to get out of the car. Brantley initially refused, but when Bryant became angry and said to him, ‘Nigger, get out of the car,’ Brantley got out of the car and stood beside the passenger’s door for several minutes. (R. 459.) Hollis then rolled down his window and told Brantley that he would be back in a few minutes. Hollis and Bryant drove off.
“Brantley testified that he waited around 10 minutes for Hollis to return, but that he got scared and walked to a service station down the road. Brantley used the telephone at the service station to call his sister to come and pick him up. Brantley also tried to reach Hollis by calling him on Hollis’s cellular telephone. Brantley testified that Bryant answered the telephone and told Brant-ley that Hollis was with Bryant’s brother. Bryant wanted to know where Brantley was so that he could come and get him. Brantley called Hollis’s cellular telephone several more times; each time he got Bryant. Brantley told Bryant that he was going to telephone the police, and Bryant said that he did not want any trouble. Brantley’s sister *1099 then arrived to pick Brantley up, and they telephoned the police.
“Ricky Vickers testified that on the evening of January 27, 1997, he saw Bryant leave with Hollis in Hollis’s car. Vickers testified that later that same night Bryant returned to his house in Hollis’s car, but that Bryant was alone. Vickers later went riding with Bryant in the car, and Bryant told Vickers that Hollis was' with a friend of Bryant’s. Bryant and Vickers went to ‘Mickey’s,’ a nightclub. ' When Bryant and Vickers left the club, the police were standing around Hollis’s car. Vickers walked off, and Bryant picked him up several blocks away from the club in Hollis’s ear. Vickers testified that Bryant had said he wanted him to help him do something. Vickers stated that Bryant told him that Bryant had done something, and that he ‘had to kill the victim.’ (R. 524.) Vick-ers testified that Bryant had a gun and told him that if he did not help him, he was ‘going to do Vickers.’ (R. 526.) The two men then went back to Vick-ers’s house, where they each got a pair of gloves. Bryant then drove to where Hollis’s body was located. Vickers testified that after Bryant put some clothes and towels in the trunk of Hollis’s car, they put Hollis’s body in the trunk.
“Vickers testified that he and Bryant drove to Greenwood, Florida, to the home of Raymond Mathis. Mathis rode around with Bryant and Vickers in Hollis’s car, and Bryant and Mathis discussed selling Hollis’s cellular telephone. According to Vickers, Mathis said that he knew someone who would give them crack in exchange for the cellular telephone. After Bryant traded Hollis’s cellular telephone for crack, the men returned to Mathis’s house, and Bryant told Mathis that there was a body in the trunk. Bryant wanted to know where he could dump the body. Bryant, Vick-ers, and Mathis left Mathis’s house, drove down a dirt road, and dumped Hollis’s body. Bryant and Vickers then drove to Tallahassee, Florida, where they tried unsuccessfully to sell Hollis’s car. Bryant and Vickers retened to Dothan, and abandoned' Hollis’s car, after cleaning the inside and wiping away any fingerprints. Vickers testified that they then looked for' the ‘other guy’ (Brantley) because Bryant believed that Brantley could identify him. According to Vickers, Bryant planned to kill Brant-ley. Raymond Mathis testified to essentially the same facts as did Vickers.
“Lori Ann Andrews, Bryant’s girlfriend, testified that on January 29, 1997, Bryant and Vickers arrived at her apartment in a black car that she had never seen before. Bryant asked her if she would pick him up at his mother’s house in a few minutes. Bryant and Vickers left, and Andrews picked Bryant up as he had requested,'and they went back to her apartment. Andrews further testified that the police came to her apartment to arrest Bryant that evening, and that when they knocked on the door, Bryant tried to give her a set of keys. The keys were later identified at trial as belonging to Hollis.
“Testimony at trial further revealed that a bloodstain on Bryant’s blue jeans was consistent with a mixture of Bryant’s blood and Hollis’s blood. Bloodstains found inside the trunk of Hollis’s car and on the' bumper and taillight of the car were consistent with Hollis’s blood.
“In his statement to police, Bryant initially denied any involvement in Hollis’s murder. However, he eventually admitted to being with Hollis in Hollis’s car, but he claimed that Hollis left with a ‘guy named Terry Johnson’ and that ■he let Bryant use his car. Bryant said *1100 that he saw Johnson later that night and that Johnson had asked him to move Hollis’s body. Bryant stated that he agreed to do-it for a substantial amount of cocaine, and he got Vickers to help him dump the body in Florida. Bryant denied shooting Hollis, but said that he was with. Johnson when Johnson shot Hollis. When- giving his statement, Bryant was asked why.it took so many shots (three shots to the head) to. kill the victim. According to testimony from the police officer taking the statement, Bryant said ‘Man, I don’t know, I think I need help. Sometimes I am just not Jerry.’ (R. 788.) According to the officer, Bryant, then put his head down, covered his ears, and refused to talk anymore.”
951 So.2d at 706-08.

Standard of Review

“[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). “However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion.when he denied the petition.’” Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992)). “On direct appeal we reviewed the record for plain error; however, the plain-error standard of review does not apply to a Rule 32 proceeding attacking a death sentence.” Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008).
Moreover, “there exists a long-standing and well-reasoned principle that we may affirm the denial of a Rule 32 petition if the denial is correct for any reason.” McNabb v. State, 991 So.2d 313, 333 (Ala.Crim.App.2007). That general rule is limited only by due-process constraints that “require some notice at the trial level, which was omitted, of the basis that would otherwise support an affirmance, such as when a totally omitted affirmative defense might, if available for consideration, suffice to affirm a judgment.” Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003). In the context of Rule 32 proceedings, “the language of Rule 32.3 [placing the burden on the State to plead any ground of preclusion in Rule 32.2] ... has created the narrow due-process constraint discussed in Liberty National,” McNabb, 991 So.2d at 334, by making the preclu-sions in Rule 32.2 affirmative defenses and prohibiting this Court from sua sponte applying those preclusions for the first time on appeal. See Ex parte Clemons, 55 So.3d 348 (Ala.2007). Thus, although the preclusions in Rule 32.2 “ ‘apply with equal force to all cases, including those in which the death penalty has been imposed,’” Nicks v. State, 783 So.2d 895, 901 (Ala.Crim.App.1999) (quoting State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App.1993)), only if those affirmative defenses are asserted by the State or found by the circuit court may this Court apply them on appeal.
I.
Before addressing the specific claims raised in Bryant’s petition and on appeal, we first address preliminary arguments Bryant makes on appeal regarding the conduct of the Rule 32 proceedings and procedural errors he claims the circuit court made in summarily dismissing his amended petition.
A.
First, Bryant contends that, in summarily dismissing his amended peti *1101 tion, the circuit court “improperly blurred what he must plead to survive summary dismissal with what he must ultimately prove to win on the merits.” (Bryant’s brief, at p. 20.) Specifically, Bryant argues that references in the circuit court’s order to “conclusions of fact” and “factual conclusions and opinions which are substantially mere allegations” show that the circuit court improperly placed a burden of proof on him at the pleading stage of the proceedings. Bryant also argues that the circuit court erred in making findings on the merits, of some of his ineffeetive-assis-tance-of-counsel claims without first affording him an evidentiary hearing and an opportunity to prove those claims. He further argues that, in making some of its findings on the merits, the circuit court improperly “overstated] the burden of proof’ to establish ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). (Bryant’s brief, at p. 28.) Bryant raised these arguments in his post-judgment motion to reconsider. Therefore, they are properly before this Court for review.
It is well settled that a postconviction “claim . may not be summarily dismissed because the petitioner failed to meet his burden of proof at the initial pleading stage, a stage at which the petitioner has only the burden to plead.” Johnson v. State, 835 So.2d 1077, 1080 (Ala.Crim.App.2001). As this Court explained in Ford v. State, 831 So.2d 641 (Ala.Crim.App.2001):
“[A]t the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence. Rather, at the pleading stage, a petitioner must provide only ‘a clear and specific statement of the grounds upon which relief is sought.’ Rule 32.6(b), Ala. R.Crim. P. Once a petitioner has met his burden of pleading so as to avoid summary. disposition pursuant to Rule 32.7(d), Ala. R.Crim. P., he is then entitled to an opportunity to.present evidence in order to satisfy his burden of proof.”
831 So.2d at 644.
However, the burden of pleading is a heavy one. Pursuant to Rule 32.3, Ala. R.Crim. P., “the petitioner has the burden of pleading ... the'facts necessary to entitle the petitioner to relief.” Rule 32.6(b), Ala. R.Crim. P., requires that the petition “contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.” As this Court explained in Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003):
“ ‘Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.’ Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading-of a conclusion ‘which, if true, -entitle[s] the petitioner to relief.’ Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitle[s] a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.”
913 So.2d at 1125.
“The burden of pleading under Rule 32.3 and Rule 32.6(b) is "a heavy one. Conclusions unsupported, by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual *1102 basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala.Crim.App.2003).”
Hyde v. State, 950 So.2d 344, 356 (Ala.Crim.App.2006). Moreover, “the pleading requirements of Rule 32 apply equally to capital cases in which the death penalty has been imposed.” Taylor v. State, 157 So.3d 131, 140 (Ala.Crim.App.2010). After thoroughly reviewing the circuit court’s order, we conclude that the court did not confuse the burden of pleading with the burden of proof. Although at times inart-fully worded, the circuit court’s order properly applied the heavy burden of pleading as set forth above.[2] Therefore, Bryant’s argument that the circuit court confused the burden of pleading with the burden of proof is meritless.
In addition, a circuit court may, in some circumstances, summarily dismiss a postconviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R.Crim. P., provides:
“If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.”
“ ‘Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition.’ ” Bishop v. State, 608 So.2d 345, 347-48 (Ala.1992) (emphasis added) (quoting Bishop v. State, 592 So.2d 664, 667 (Ala.Crim.App.1991) (Bowen, J., dissenting)). See also Hodges v. State, 147 So.3d 916, 946 (Ala.Crim.App.2007) (a postconviction claim is “due to be summarily dismissed [when] it is meritless on its face”).
Moreover, “a judge who presided over the trial or other proceeding and observed the conduct of the attorneys at the trial or other proceeding need not hold a hearing on the effectiveness of those attorneys based upon conduct that he observed.” Ex parte Hill, 591 So.2d 462, 463 (Ala.1991).
“'“In some cases, recollection of the events at issue by the judge who presided at the original conviction may enable him summarily to dismiss a motion for postconviction relief.” Little v. State, 426 So.2d 527, 529 (Ala.Cr.App.1983). “If the circuit judge has personal knowledge of the actual facts underlying the allegations in the petition, he may deny the petition without further proceedings so long as *1103 he states the reasons for the denial in a written order.” Sheats v. State, 556 So.2d 1094, 1095 (Ala.Cr.App.1989).’ ”
Ray v. State, 646 So.2d 161, 162 (Ala.Crim.App.1994) (quoting Norris v. State, 579 So.2d 34, 35 (Ala.Crim.App.1991) (Bowen, J., dissenting)). In this case, the judge who ruled on Bryant’s petition was the same judge who presided over Bryant’s original trial and over his second penalty-phase trial. Therefore, we find no error on the part of the circuit court in summarily dismissing some of Bryant’s claims on the merits.[3]
Finally, we reject Bryant’s argument that the circuit court improperly applied a stricter burden to establish ineffective assistance of counsel, than that espoused in Strickland, supra. As explained more thoroughly below, under Strickland, a petitioner must establish: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by counsel’s deficient performance. To establish prejudice, a petitioner must establish that there is a reasonable probability that, but for counsel’s alleged errors, the result of the proceeding would have been different. As explained in Part II of this opinion, the heavy burden of pleading as set forth above applies to ineffective-assistance-of-counsel claims. Although the circuit court’s statements in its order that the facts alleged by Bryant in some of his claims of ineffective assistance of counsel “would not necessarily have made any difference” in the outcome of the trial, do not exactly track the specific language used in Strickland, after thoroughly reviewing the order, we do not believe that the circuit court applied an incorrect burden to assess Bryant’s ineffective-assistance-of-counsel claims, and Bryant’s argument to the contrary is meritless.
B.
Bryant also contends that the circuit court erred in considering his ineffective-assistance-of-counsel claims “on a piecemeal basis,” instead of considering all the claims cumulatively. (Bryant’s brief, at p. 25.) He argues that “Alabama law does not permit piecemeal treatment of an ineffective-assistance claim,” and that “[t]he Alabama Supreme Court has ‘condemned and rejected? the proposition that a trial court should not consider the cumulative effect of error.” (Bryant’s brief, at p. 25;)
Initially, we note that Bryant did not raise this argument in his postjudgment motion to reconsider. “The general rules of preservation apply to Rule 32 proceedings.” Boyd v. State, 913 So.2d 1113, 1123 (Ala.Crim.App.2003). In addition, although Bryant did assert a claim at the conclusion of his amended petition that the cumulative effect of all the errors alleged in his petition, i.e., both his numerous substantive claims and his numerous ineffective-assistance-of-counsel claims, entitled him to relief, he did not specifically assert a claim in his petition that the cumulative effect of his counsels’ alleged errors entitled him to relief. A circuit court cannot be expected to address a claim not raised in the Rule 32 petition, and.“[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition.” Arrington v. State, 716 So.2d 237, 239 (Ala.Crim.App.1997). Therefore, this argument is not properly before this Court for review.
Moreover, even if this argument were properly before this Court, it is meritless. *1104 Bryant’s reliance on the Alabama Supreme Court’s opinions in Ex parte Bryant, 951 So.2d 724 (Ala.2002), Ex parte Woods, 789 So.2d 941 (Ala.2001), and Ex parte Tomlin, 540 So.2d 668 (Ala.1988), for the proposition that this Court must always examine the cumulative effect of alleged errors is misplaced. All- of those opinions involved direct appeals from capital-murder convictions and sentences of death — appeals that involved substantive issues that had been raised-on appeal, not ineffective-assistance-of-counsel claims — and ■ appeals in which the plain-error rule applied. See Rule 45A, Ala. R.App. P. However, as noted above, the plain-error rule does not apply in appeals from the dismissal of Rule 32 petitions, even in cases in which the death penalty has been imposed, and Bryant’s argument here is based on claims of ineffective assistance of counsel, not substantive claims.
Furthermore, it is -well settled in Alabama that an ineffeetive-assistance-of-counsel claim is a general claim that consists of several different allegations or subcategories, and, for purposes of the pleading requirements in Rule 32.3 and Rule 32.6(b), “[ejach subcategory is [considered] a[n] independent claim that must be sufficiently pleaded.” Coral v. State, 900 So.2d 1274, 1284 (Ala.Crim.App.2004), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005). As this Court explained in Taylor v. State, 157 So.3d 131 (Ala.Crim.App.2010):
“Taylor also contends that the allegations offered in support of a claim of ineffective assistance of counsel must be considered cumulatively, and he cites Williams v. Taylor, 529 U.S. 362 (2000). However, this Court has noted: ‘Other states and federal courts are not in agreement as to whether the “cumulative effect” analysis applies to Strickland claims’; this Court has also stated:
“We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel.’ Brooks v. State, 929 So.2d 491, 514 (Ala.Crim.App.2005), quoted in Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d -, - (Ala.Crim.App.2010); see also McNabb v. State, 991 So.2d 313, 332 (Ala.Crim.App.2007); and Hunt v. State, 940 So.2d 1041, 1071 (Ala.Crim.App.2005). More to the point, however, is the fact that even when a cumulative-effect analysis is considered, only claims that are properly pleaded and not otherwise due to be summarily dismissed are considered in that analysis. A cumulative-effect analysis does not eliminate the pleading requirements established in Rule 32, Ala. R.Crim. P. An analysis of claims of ineffective assistance of counsel, including a cumulative-effect analysis, is performed only on properly pleaded claims that are not summarily dismissed for pleading deficiencies or on procedural grounds. Therefore, even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor’s obligation to plead each claim of ineffective assistance of counsel in complianeé with the directives of Rule 32.”
157 So.3d at 140 (emphasis added). Because, as explained below, the majority of Bryant’s ineffective-assistance-of-counsel claims were properly summarily dismissed because they were insufficiently pleaded, a cumulative-error analysis here would not encompass all of Bryant’s 'claims of ineffective assistance of counsel. ‘ Therefore, the circuit court did not err in not considering all of Bryant’s claims of ineffective assistance of counsel cumulatively.
II.
Bryant contends that the circuit court erred in summarily dismissing several of *1105 his claims of ineffective assistance of counsel because, he says, those claims were sufficiently pleaded and were meritorious on their face and thus entitled him to an evidentiary hearing. (Issues II and V.A. in Bryant’s brief.) For the reasons explained below, we find that the most of Bryant’s ineffective-assistance-of-counsel claims were properly summarily dismissed by the circuit court. However, we agree with Bryant as to three of his claims of ineffective assistance of counsel, and we must remand this case for further proceedings on those claims.
As noted above, when reviewing a petitioner’s claims of ineffective assistance of counsel, we apply the standard articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must establish: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by counsel’s deficient performance.
“First, the defendant, must show that counsel’s .performance was deficient. This requires showing, that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This , requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
Strickland, 466 U.S. at 687.
“To meet the first prong of the test, the petitioner must show that his counsel’s representation fell below an objective standard of reasonableness. The performance inquiry must be whether counsel’s assistance w,as reasonable, considering all the circumstances.” Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987). “ ‘This court must avoid using “hindsight” to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.’” Lawhorn v. State, 756 So.2d 971, 979 (Ala.Crim.App.1999) (quoting Hallford v. State, 629 So.2d 6, 9 (Ala.Crim.App.1992)). “A court must indulge a strong presumption that counsel’s .conduct falls within the wide range of reasonable professional assistance.” Strickland, 466 U.S. at 689.
“Judicial scrutiny of counsel’s performance must'be highly deferential. It is all too tempting for a defendant, to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proyed. unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to-reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because. of the difficulties inherent in making the evaluation, a court must indulge a strong, presumption that counsel’s conduct fajls within the wide range of reasonable professional assistance; that is, the. defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered -sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101 *1106 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular' client in the same way.”
Strickland, 466 U.S. at 689.
“[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be'a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but - only what is, constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir.2000) (footnotes- omitted).
To establish the second prong of the test, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. “It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.” Id. at 693. “When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating-and mitigating circumstances did not warrant death.” Id. at 695.
In addition, as noted above, the burden of pleading a claim in a Rule 32 petition is a heavy one. This is equally true when it comes to pleading a claim of ineffective assistance of counsel. '
“To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must ‘identify the [specify] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,’ Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating ‘that there is a reasonable probability that,- but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ 466 U.S. at 694, 104 S.Ct. 2052. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient.”
Hyde v. State, 950 So.2d 344, 356 (Ala.Crim.App.2006).
With these principles in mind, we address each of Bryant’s claims in turn.
A.
Bryant contends that he sufficiently pleaded his claim that trial counsel *1107 at his first trial were ineffective[4] for not conducting adequate voir dire of the jury venire in order to discover that one venire-member, J.K., who ultimately sat on his jury, was biased. In his amended petition, Bryant alleged the following with respect to this claim: ■
“Mr; Yarbrough failed to adequately voir dire a juror [J.K.]- who- failed to respond to Mr. Yarbrough’s question as to whether any of the venire had ties to law enforcement or knew anyone in law enforcement. Had Mr. Yarbrough adequately questioned [J.K.], Mr. Yar-brough would have discovered that this individual had applied to the Drug Enforcement Agency and been denied a job and that this denial affected him for the rest of his life. Mr. Yarbrough would have discovered that ever since his rejection, this juror harbored an obsession with law enforcement.. Mr.. Yarbrough would have also discovered that this juror was a police fanatic who drove the same make and model of cars as unmarked police cars, kept numerous police scanners in his car, and followed the police to crime scenes. Mr. Yarbrough would have easily discovered that this juror had preconceived ideas about the truthfulness of fellow officers of the law. Mr. Yarbrough would have likely discovered that the potential juror was someone who advocated law enforcement and possessed potential biases worthy of disqualification from the jury.
“However, defense counsel failed to adequately voir dire the . venire member to see if there were any prejudices that might ultimately disqualify the venire member for cause. In fact, this venire 'member himself was surprised to have been left on the jury. This was clearly an abdication of counsel’s duty to guarantee his client a right to a fair trial by adequately performing a voir dire on the jury panel and seriously prejudiced Bryant. Trial-counsel’s enumerated failures in voir , dire denied Bryant his constitutional right to a fair and impartial jury. There was no strategic reason for such errors and Bryant should be granted a new trial.”
(C. 461-62.)
This claim was not sufficiently pleaded. First, although Bryant repeatedly stated in his amended petition that counsel did not “adequately” question juror J.K., he failed to specifically identify what additional- questions he believes- counsel should have asked the venire, or J.K. in particular, that would have revealed any bias on the part of J.K. See, e.g., Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d - (Ala.Crim.App,2009). Second, although Bryant alleged that counsel asked the venire whether anyone “had ties to law enforcement or knew anyone in law enforcement,” he failed to allege what additional questions, if any, his counsel asked on this issue or what questions, if any, were asked by the prosecutor or the trial court on this issue. Finally, while Bryant made bare and eonclusory allegations that J.K. had an “obsession” -with law enforcement, had “preconceived ideas about the truthfulness of fellow officers of the law,” and “advocated law enforcement,” he failed to allege sufficiently specific facts indicating that J.K’s alleged feelings about law *1108 enforcement “rose to the level of bias that would have- supported a challenge for cause -or that would have resulted in counsel’s exercising a peremptory strike against” J.K. Beckworth, — So.3d at -. Indeed, Bryant did- not even allege that counsel, would have challenged J.K. for cause or used a peremptory strike to remove J.K. from the jury had counsel known of J.K.’s alleged “obsession” and “preconceived ideas.”
We note that Bryant alleges additional, and more specific, facts in his brief on appeal regarding this claim. However, these factual allegations were not included in his petition or amended petition; therefore,- they are - not properly before this Court for review and will not be considered. See, e.g., Bearden v. State, 825 So.2d 868, 872 (Ala.Crim.App.2001) (“Although Bearden attempts to include more specific facts regarding his claims of ineffective assistance of counsel in his brief to this Court, those allegations are not properly before this Court for review because Bearden did not include them in his original- petition- before the circuit court.”). See also Hodges v. State, 147 So.3d 916 (Ala.Crim.App.2007), and Hyde v. State, 950 So.2d 344 (Ala.Crim.App.2006).
Becaüse' this claim failed to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b), summary dismissal was proper under Rule 32.7(d).[5] •
B.
Bryant contends that he sufficiently pleaded in his amended petition his claim that trial counsel at his first trial and trial counsel at his second penalty-phase trial were ineffective for not properly investigating and preparing for Bryant’s trials.[6] Specifically, he argues that he sufficiently pleaded that his trial counsel (1) failed to investigate the blood spatter at the scene where Hollis was killed and to retain a blood-spatter expert; (2) failed to investigate the blood found on his blue jeans and retain a DNA expert; and (3) failed to investigate the two used condoms found at the scene where Hollis was killed and to retain a DNA expert to have the two condoms tested for DNA.[7]
In his amended petition, Bryant alleged the following facts with respect to' this claim:
“Both trial and resentencing counsel failed to investigate the [lack of] physical evidence in the case. Neither Mr. Yar-brough nor Mr. Crespi ever retained a blood spatter expert who could analyze the crime scene and Bryant’s clothing to determine whether the blood spatter found was consistent with, the type of *1109 wounds Donald Hollis sustained. Trial testimony revealed that blood spatter was found on a building, on trees, and on the ground in the area where the murder occurred. During the trial and re-sentencing trial, the medical examiner testified that Donald Hollis was shot three times at close range. However, only a minuscule amount of blood (a drop the size of an eraser on a pencil) was found on Bryant’s clothing. And, the State could not even conclusively demonstrate that the minuscule amount of blood was Hollis’ blood, but rather was a combination of Hollis’ and Bryant’s blood. In spite of the gross contradiction between the State’s evidence and medical testimony, neither trial nor resentencing counsel retained a blood spatter expert to independently analyze the crime scene and Bryant’s clothing to determine whether the blood spatter found on Bryant was consistent with the types of wounds Donald Hollis sustained.
“Had trial or resentencing counsel procured a blood spatter expert to examine the evidence, the expert would have 'conducted tests to recreate the crime. Based on that recreation, the expert may have testified that a person who shoots another at close proximity should have a significant amount of blood on his person. Or the expert may have testified that where the gun shot wounds create blood spatter in the pattern as on and proximity to the building at the location where Hollis was shot, the shooter would have a significant amount of blood on his clothing or, at a minimum, more than a minuscule drop of blood that cannot even be attributed solely to the victim. Counsels’ failure to procure a blood spatter expert fell below the objective standard of reasonableness and seriously prejudiced Bryant because the expert may have presented potentially exculpatory evidence. • But for counsel’s failure to call á blood spatter expert, there is a reasonable likelihood that Bryant would have been acquitted or would have avoided a death sentence. At the time of Bryant’s original and resentencing trials, numerous blood spatter experts were available to, testify, including Captain Tom Bevel, owner of TBI LLC located in Oklahoma, and Gary Rini, forensic science consultant located in Cleveland, Ohio. Had counsel followed these-investigative leads, both trial counsel and resentencing counsel could have uncovered evidence that contradicted the State’s case which may have undermined the State’s ability to sentence Bryant to death.
“... As of the filing of this Amended Petition, the Court has denied- Bryant discovery of physical evidence but once discovery is allowed, Bryant fully intends to retain a forensic expert to investigate the blood spatter evidence,
“During the first trial, the State’s expert testified that as a result of DNA testing he believed the tiny blood spot found on Bryant’s pants was a mixture of Bryant’s and the victim’s blood. The expert, however, testified that he could not be "absolutely sure. Mr. Yarbrough presented no expert in his case-in-chief to contradict or provide the jury an alternative explanation regarding the blood and to whom it belonged. Furthermore, resentencing counsel did not present an expert on DNA evidence. A DNA expiert would have evaluated the viability of obtaining á positive DNA match on such a small amount of blood. Had the DNA expert indicated that it was impossible to obtain a reliable DNA result on -this sample, it would have removed the one piece of physical evidence tying Bryant to Hollis’ homicide. As of the filing of this Amended Petition, the *1110 Court has refused Bryant discovery of physical evidence but once discovery is allowed, Bryant fully intends to retain a forensic expert to investigate DNA evidence.
“Furthermore, both trial and resen-tencing counsel (as well as the police) believed that the crime was sexually motivated, but neither counsel conducted an adequate investigation into any possible connections regarding the sexual undertone of this crime. Two used condoms were found at the scene of the crime that undoubtedly contained DNA of a person or persons involved in the crime, but counsel failed to get the condoms tested, or file appropriate motions regarding this evidence.
“The failure of both trial counsel and resentencing counsel to present an expert on DNA evidence is below the objective standard of reasonableness and seriously prejudiced Bryant because the expert may have presented exculpatory evidence. According to Mr. Yar-brough’s notes, Cellmark Diagnostics, Inc., a forensic laboratory located in Germantown, Maryland, was available and willing to do DNA testing on the evidence in this case. But for counsel’s failure to call a DNA expert, there is a reasonable likelihood that Bryant would have been acquitted or would have avoided a death sentence. Had counsel followed these investigative leads, both trial counsel and resentencing counsel could have challenged the aggravating circumstances relied on by the State to sentence Bryant to death.”
(C. 465-68.)
With respect to this claim as it relates to Bryant’s counsel at his second penalty-phase trial, we find the claim to be meritless on its face. The only issue at the second penalty-phase trial was what sentence Bryant should receive for his capital-murder conviction. Bryant’s guilt as to the crime had already been determined in the first trial and could not be attacked at the second penalty-phase trial. The investigation and evidence Bryant asserted that his counsel should have conducted and presented at his second penalty-phase trial — a blood-spatter expert and a DNA expert— would have, as Bryant alleged in his petition, challenged the State’s evidence of his guilt of the crime, not what punishment he should receive. However, the Alabama Supreme Court has held that “[rjesidual doubt is not a mitigating circumstance” to be considered at the penalty phase of a capital trial. Ex parte Lewis, 24 So.3d 540, 544 (Ala.2009). In addition, this Court specifically held on appeal from Bryant’s second penalty-phase trial that the trial court had correctly denied Bryant’s request for a jury instruction on residual doubt. Therefore, this claim is meritless insofar as it relates to Bryant’s counsel at his second penalty-phase trial.
However, with respect to this claim, as it relates to Bryant’s counsel at his first trial, we find this claim to be sufficiently pleaded and meritorious on its face. Bryant did not merely make a bare allegation that his constitutional rights had been violated or state mere conclusions of law. He identified the specific experts he believed counsel should have retained (even naming the specific experts who were available at the time of his first trial), alleged what he believed those experts could have discovered and testified to had they been retained, and explained how the lack of testimony from such experts prejudiced his defense. In light of the nature of these claims and the circuit court’s blanket denial of Bryant’s discovery request, we fail to see what additional information Bryant could have possibly alleged. Therefore, we conclude that Bryant pleaded sufficiently specific facts with respect to *1111 these claims to satisfy the pleading requirements in Rule 32.3 and Rule 32.6(b) and to entitle him to an opportunity- to prove these claims at an evidentiary hearing.
C.
Bryant also contends that he sufficiently pleaded his claim that his trial counsel at his first trial were ineffective for not properly investigating .and presenting evidence to support a motion to suppress the first statement he made to police. Specifically, he argues that he pleaded sufficient facts indicating that he had requested a lawyer before his first interrogation the night he was arrested, that the request was ignored by the police, and that his trial counsel knew about the request but failed to investigate or present evidence of that request in order to suppress that first statement or his second statement, made to police the next day.
In his amended petition, Bryant alleged the following with respect to this claim-:
“During' the pre-trial phase of Bryant’s trial, Mr. Yarbrough moved to suppress the second interrogation (captured on tape) conducted by the Dothan Police Department on January 30, 1997. Counsel was granted a hearing on his motion to suppress Bryant’s second statement. Counsel, however, failed to present critical evidence that unquestionably would have resulted in the suppression of the first statement (taken on January 29, 1997 and unrecorded, but about which Sgt. Stanley was allowed to testify) and could have affected the outcome on the motion to suppress ruling. Specifically, Counsel failed to present evidence by Sheiliah Gayle Bryant McCree that Bryant had asked for an attorney prior to the January 29 police interrogation. Although McCree did not overhear any part of the second interrogation on January 30, her testimony regarding what occurred with respect to the first statement would have buttressed Bryant’s multiple requests during the second interrogation for a lawyer.
“On the night of January 29, 1997, the night of Bryant’s first interrogation by the Dothan Police Department, he phoned his sister Sheiliah Gayle Bryant McCree. Their conversation took place on speakerphone with Sgt. Stanley in the room. Bryant told Sheiliah Bryant they were accusing him of capital murder. She advised Bryant to ask for an attorney and not to say anything until he received one. The speakerphone remained on after she and Bryant said goodbye. She then heard Bryant ask for cigarettes and a lawyer. The police told Bryant they would get him a lawyer, but continued the interrogation and told him he needed to ‘answer them questions.’ After approximately thirty seconds, someone realized the speaker was still on, and ended the call. Ms. McCree told Bryant’s attorney what she had overheard. That attorney had to withdraw due to a conflict of interest. Ms. McCree subsequently told court appointed attorneys Mr. Motley and Mr. Yarbrough about the portion of the interrogation that she had overheard[.] Ms. McCree’s testimony about what she overheard and Sgt. Stanley’s refusal to honor Bryant’s exercise of his right certainly provided grounds for excluding the entirety of Bryant’s January 29, 1997 statement. Without that statement, the State would have had no basis for asserting that Bryant made a comment during the interrogation which the police took as an admission of killing Hollis. (According to Sgt. Stanley, in response to Stanley’s question regarding why Bryant shot Hollis three times and *1112 what was on Bryant’s mind, Bryant responded ‘I don’t know, I think I need help. ' Sometimes X am just not Jerry.’)
“In addition, during .the second interrogation, which was tape-recorded, .Bryant consistently asked for a lawyer. The police ignored, his requests and continued asking him questions, despite Bryant’s very clear and repeated invocation of his right to counsel.
“In spite of being in possession of such critical information, Mr. Yarbrough failed to move to suppress the first (unrecorded) statement, to call Ms. McCree to testify at the suppression hearing, and to introduce this critical piece of evidence of a constitutional violation under Miranda v. Arizona, 384 U.S. 436 (1966). Subsequently, the motion to suppress the second statement was denied in substantial part (the first 66 pages of the written transcript from the January 30, 1997 interrogation were not suppressed, even’though Bryant had requested a lawyer numerous times prior to page 66 of the transcript) and Bryant’s interrogation and statements were admitted at trial through Sgt. Stanley’s testimony. Had Mr. Yar-brough called Ms. McCree to testify, there is a reasonable likelihood that the court would have excluded Bryant’s statements from trial. Ms. Bryant’s testimony would have demonstrated that Bryant sought counsel immediately upon arrest and therefore none of the statements he made were voluntary and freely given.
“Mr. Yarbrough’s - failure to provide critical evidence at the suppression hearing prejudiced Bryant because Bryant’s statements' were' admitted at trial. Mr. Yarbrough’s actions cannot be attributed to reasonable trial strategy. •
“But for counsel’s failure to provide critical evidence at the suppression hearing there is a reasonable probability that Bryant would have been acquitted or would have avoided a death sentence. Mr. Yarbrough’s failure to provide crucial evidence to exclude Bryant’s statement constitutes ineffective assistance of counsel that severely ■ prejudiced Bryant.”
(C. 474-76.)
We also find this claim to be sufficiently pleaded and meritorious • on its face. Bryant alleged with specificity counsel’s omission that he believed constituted deficient performance- — not moving to suppress his first statement to police and not calling his sister to testify to establish that that first statement was obtained in violation of his right to counsel — and he alleged with specificity how he was prejudiced by counsel’s orhission — that his first statement would likely have been suppressed thereby negating the State’s ability to argue that • his first- statement included a confession -to the crime. -Therefore, Bryant pleaded sufficiently specific facts -with respect to this claim to satisfy the pleading requirements in Rule 32.3 and Rule-.32.6(b) and to entitle him to an opportunity to prove this claim at an eviden-tiary hearing.
D.;
Bryant contends that he sufficiently pleaded his claims that trial counsel at his first trial and trial counsel at his second penalty-phase trial were ineffective for failing to adequately impeach Ricky -Vick-ers’s testimony, and that trial counsel at his second penalty-phase trial were ineffective for failing to adequately challenge Vickers’s unavailability — which ultimately •led to Vickers’s testimony from Bryant’s first trial being read to the jury at the second penalty-phase trial.
*1113 In his amended petition, Bryant alleged the following with respect to these claims:
“Mr. Yarbrough failed to properly impeach State’s witness Ricky Vickers [at his first trial] by: (1) not pointing out the major inconsistencies between prior statements made' by Vickers; (2) not adequately exploring what the State: offered to Vickers in exchange ■ for his cooperation and testimony; (3) not revealing Vickers’[s] previous felony convictions; and (4) not pointing out Vick-erses] general lack of character fotruthfulness.
“Vickers gave a statement to Sergeant Jim Stanley on January 30, 1997 and gave another statement. to Sergeant David Jay on January 31, 1997. Both these statements differed from each other and from the story that Vickers ultimately told on the stand during Bryant’s original trial.
“For example, at trial, Vickers testified that Bryant drove to the house of a person who Vickers identified at trial as being • Raymond Mathis. Vickers said that Bryant and Mathis- discussed the -sale of the cell phone, following which Mathis carried the phone to ‘some guy’ in exchange for some dope: In his January 29 and 30, 1997 statements to the police, Vickers never mentioned anything about going to Raymond Mathis’s house or Mathis’s involvement with the cell phone. In fact, in his January 29 and 30 statements, Vickers never mentioned anything about the cell phone (other than Bryant talking on the cell phone) or Bryant selling the cell phone until January 30, when the police asked whether Bryant still had the cell phone when they left the body on the dirt road. In response, Vickers gave varying answers before. finally settling on saying that he thought, but could-not be sure since he was on drugs, that Bryant had pulled off at a store and given a man standing on the corner at the store the cell phone in exchange for some drugs. In his January. 31 statement, Vickers gave yet a different version of the event. Vickers said that Bryant went to Mathis’s house, gave Mathis the cell phone, .Mathis, gave Bryant directions to the house of a woman, Mathis went into the woman’s house, and when Mathis returned to the car, he no longer had the cell phone but did have some dope. Again, Mr. Yarbrough did not highlight any of these inconsistencies.
“Vickers .also, testified at trial that Mathis told him and Bryant where they could leave a body; knew there was a body in the car; rode with them, and identified the dirt road where they could leave the body, and got out of the car and watched while Vickers and Bryant removed the.body from the trunk and placed it on the hill. In his January 29 statement to the.police, Vickers never mentioned - anything about Mathis’s involvement in moving the body.
“At trial, Vickers testified that he was with Bryant '-when Bryant parked the car. In his January 30 statement to the police, Vickers outright ■ denied being with Bryant when Bryant parked the car. In that same statement, Vickers also -said- that he did' not, at any time ■during the night, hold the gun that Bryant allegedly had been holding or possessed during the entire time he was ■with Vickers. In his January 31 statement, however, Vickers admitted holding the gun.
“Mr. Yarbrough also failed to adequately explore what the State offered to Vickers in exchange for his cooperation and testimony. While Mr. Yarbrough did question Vickers, Mr. Yarbrough’s examination was grossly, inadequate. Mr. Yarbrough’s examination of Vickers on this issue *1114 consisted of whether he had been convicted of selling dope and brief questioning regarding whether capital murder charges had been dropped against Vickers in exchange for his testimony. Mr. Yai'brough failed to question and impeach Vickers using his prior bad acts which would have revealed Vickers[’s] extensive history of drug use and would have emphasized Vickers[’s] overwhelming incentive to cut a deal with the prosecutor.
“Although the police initially questioned Vickers for murder, the State subsequently reduced the charge to hindering prosecution. The District Attorney’s standard procedure when seeking the cooperation of a witness who had other criminal charges pending was to get the guilty plea prior to the witness’s testimony and then schedule the sentencing hearing for some time after the case in which the witness would testify. Depending on ‘how good’ the prosecutor determined the witness’s testimony to be, the prosecutor would determine the recommended sentence for the witness in his criminal case. The prosecutor followed the same procedure when dealing with Vickers. Trial counsel’s failure to discover and impeach Ricky Vickers’s testimony in this regard could not be considered strategic.
“Mr. Yarbrough also failed to call character -witnesses to testify to Vick-erses] character for truthfulness; residents of the Bottoms neighborhood would have testified that Vickers had an acute drug problem and therefore his statements were unreliable and that he was generally an untruthful person. These character witnesses would have also testified that Vickers was clearly under the influence of drugs during his testimony at trial.
“But for Mr. Yarbrough’s failures described above, there is a reasonable probability that Bryant would have been acquitted or would have avoided a death sentence. Mr. Yarbrough’s deficient performance fell below the objective standard of reasonableness and prejudiced Bryant because Mr. Yarbrough permitted biased and unreliable testimony against Bryant.
[[Image here]]
“Resentencing counsel failed to effectively' challenge the State’s proffer of Ricky Vickers’s trial transcript instead of live testimony because Ricky Vickers was ‘unavailable’ to testify under Ala. R. Evid. 804(a)(5). (R. 11-19; R. 316-18 Remand.) The Alabama Supreme Court stated in Ex parte Scroggins, 727 So.2d 131 (Ala.1998), that the prosecution must make ‘a good faith effort to obtain the presence of the declarant at trial’ in order to offer the statement of a witness who is not present at trial and satisfy the right of confrontation. The State must exercise due diligence in its attempt to procure the presence of a witness. Johnson v. State, 623 So.2d 444 (Ala.Crim.App.1993). The court imposes a high standard for proving that such due diligence took place. The party seeking to introduce the declarant’s statement has to show that it is unable to procure the declarant’s attendance either by legal process or by other reasonable means. Williams v. Calloway, 281 Ala. 249, 251-52, 201 So.2d 506, 508 (Ala.1967).
“Resentencing counsel was ineffective for failing to demonstrate to the Court that the State did not exercise due diligence in its search for Ricky Vickers. On the first day of [the second penalty-phase] trial, the State indicated that it would be offering the transcript of Vick-ers’s prior trial testimony because Vick-ers could not be located during the pre *1115 vious weekend. (R. 11-12 Remand.) Resentencing counsel never pointed out that the State did not exercise due diligence in procuring Vickers for trial. Resentencing counsel failed to point out that the ‘Bottoms’, the neighborhood where Vickers resided, spans just a couple of streets and thus it would have been very easy for the Houston County Sheriffs Office to canvass the neighborhood in search of Vickers. Resentenc-ing counsel did not argue that the State had failed to meet the due diligence standard by questioning only those people closest to Vickers, who had strong motives to keep his whereabouts secret.
“In fact, resentencing counsel was aware of Vickers’s whereabouts and knew of individuals who could testify to Vickers’s location. In fact, in a recent interview with Vickers, he stated that he remembers being in the Bottoms and that he was accessible at the time that Bryant’s resentencing hearing occurred. This alone, establishes the fact that the State did not exercise due diligence in attempting to procure Vickers for trial. Resentencing counsel were ineffective because they should have requested a recess to procure witnesses, including Vickers himself, to testify to Vickers’s whereabouts and demonstrate that the State did not exercise due diligence in its search for Vickers.
“While resentencing counsel did not bear the burden of producing Vickers for trial, resentencing counsel did have the responsibility to demonstrate that the State’s search for Vickers fell below the standard of due diligence. Resen-tencing counsel was ineffective because they did not challenge whether the State had met its burden to show that Vickers was ‘unavailable’ when the facts clearly demonstrated that Vickers was available to testify. This failure is particularly acute because Vickers’s hearsay testimony is the only evidence linking Bryant to the alleged sale of Hollis’s cell phone. The sale of the cell phone is one of only two aggravating factors on which the State relied in seeking the death penalty. Removal of Vickers’s hearsay testimony was crucial to Bryant’s defense.
“Resentencing counsel was also ineffective by not impeaching Vickers’s trial testimony with prior inconsistent statements made by Vickers on several other occasions, including statements made to police on January 29 and 30, 1997. Re-sentencing counsel only focused on Vickers’s priqr convictions to impeach Vickers; this was not effective because Vickers’s previous convictions were revealed during his transcript testimony. (R. 386-395 Remand.) In fact, the State did .not even object to the introduction of an additional conviction, because he didn’t think the admission of additional convictions would ‘make a big difference anyway.’ (R. 392-95 Remand.) Resentencing counsel acted ineffectively because he did not offer Vickers’[s] prior inconsistent statements to police that demonstrate that Vickers clearly changed his story on a number of occasions. (A full description of Vickers’[s] inconsistent statements is located at [paragraphs] 91 to 93, supra [as quoted above]).
“But for counsel’s failure to effectively challenge the state’s proffer of Vick-erses] testimony and his failure to properly impeach Vickers, there is a reasonable likelihood that Bryant would have avoided a death sentence. Counsel’s deficient performance fell below the- objective standard of reasonableness, and prejudiced Bryant by allowing. biased testimony against Bryant.”
(C. 476-83.)
In denying the claim that trial counsel at his first trial did not effectively *1116 cross-examine Ricky Vickers, the circuit court stated in.its order that “[t]he record reflects a vigorous cross-examination. of Vickers on all of the area[s] complained of.” (C. 759.) However, the circuit court did not specifically address the numerous things Bryant alleged in his amended petition could have been used to attack Vickers’s credibility, nor did it make any finding regarding whether counsel’s performance in this regard was deficient or whether counsel’s performance prejudiced Bryant. Therefore, we cannot say that the circuit court actually addressed this claim in Bryant’s petition. -In addition, we find that this claim was sufficiently pleaded to satisfy the requirements in Rule 32.3 and Rule 32.6(b). Bryant alleged the specific omissions by counsel that he believed constituted deficient performance, and he specifically pleaded in his petition the importance of Vickers’s testimony to the State’s case and how counsel’s omissions in attacking Vickers’s credibility prejudiced his defense. Therefore, Bryant is entitled to an opportunity to prove this claim at an evidentiary hearing. , ,
In denying the claim that trial counsel at his second penalty-phase trial did not effectively challenge Vickers’s unavailability or effectively impeach Vickers with his prior statements to police, the circuit court stated in its order:
“Defense counsel made every effort to [keep out of evidence Vickers’s testimony from his first trial] at the second trial unsuccessfully before this Court. Such issue is deemed moot as such was decided adversely to the Defendant on the issues raised before the Appellate Court. The fact that Vickers might’ have been present somewhere in the City of Do-than at the actual time of trial, although unknown to the Police, does not contravene requirements of unavailability.”
(C. 759.)
First, the circuit court did not address at all that portion of the claim that counsel was ineffective for not introducing into evidence Vickers’s prior statements to police to impeach his testimony. That portion of the claim, however, was sufficiently pleaded to satisfy the requirements in Rule" 32.3 and Rule 32.6(b). Bryant alleged the specific omission of counsel that he believed constituted deficient performance — the failure to' introduce Vickers’s prior statements to police (which content was fully set out in the facts portion of Bryant’s petition) — and alleged specific facts indicating how the failure to impeach Vickers, whose testimony was the only evidence of one of the two aggravating circumstances found to exist, prejudiced him.
Second, the circuit court found that portion of the claim relating to counsel’s challenge to Vickers’s unavailability to be moot because it had been raised and rejected by both the trial court and this Court. However, the circuit court failed to recognize that Bryant’s claim was based on additional evidence that he claimed was not, but should have been, presented to the trial court and this Court regarding Vickers’s unavailability, and it did not specifically address the impact of that additional evidence in relation to counsel’s performance under the two-pronged Strickland, test. Therefore, we cannot say that the circuit court sufficiently addressed this claim. Moreover, Bryant identified the specific omissions of counsel that he believed constituted deficient performance in this regard, and alleged specific facts indicating how he was prejudiced by that performance, thus satisfying the pleading requirements in Rule 32.3 and Rule 32.6(b).
Accordingly, Bryant is entitled to an opportunity to prove his claim that trial *1117 counsel at his second penalty-phase trial did not effectively challenge Vickers’s unavailability or effectively impeach Vickers with his prior statements to police at an evidentiary hearing.
E.
Bryant contends that he sufficiently pleaded his claim that trial counsel at his second penalty-phase trial were ineffective for not adequately arguing their Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion.
In his amended petition, Bryant alleged the following with respect to this claim:
“When four of seven African-American jurors were struck by the prosecution during the resentencing jury venire, Mr. Crespi failed to effectively argue that a Batson violation occurred. Mr. Crespi offered no evidence that the jurors were struck only because of race and that the State’s statements and questions indicated an intent to discriminate against African-American jurors.
“Mr. Crespi had the facts sufficient to make a prima facie case of purposeful discrimination and acted ineffectively by not doing so. The facts that Mr. Crespi could have brought to the Court’s attention but failed to do so include the following: the venire for Bryant’s trial consisted of 80 members; eighteen members of the jury venire were African-American, a ratio of 23%; the, prosecution eliminated the African-Americans quickly, using four of their first -nine strikes to eliminate all but three African-Americans. These facts demonstrate a prima facie case of discrimination because it shows that the Court and the prosecution struck 80% of African-Americans from Bryant’s jury venire.
“Furthermore, Mr. Crespi practices criminal law in Houston County and is therefore familiar with the prosecutors involved in Bryant’s case, yet resentenc-ing counsel failed to mention to the .Court that .Houston County prosecutors have a history of Batson violations. Appellate courts have found that the Houston County prosecutor involved in Bryant’s case, Gary Maxwell, Chief Assistant to the District Attorney for Houston County, discriminated in violation of Batson in at least seven reported cases. See McCray v. State, 738 So.2d 911, 914 (Ala.Crim.App.1998); Ashley v. State, 651 So.2d 1096, 1101 (Ala.Crim.App.1994); Andrews v. State, 624 So.2d 1095, 1099 (Ala.Crim.App.1993); Williams v. State, 620 So.2d 82, 86 (Ala.Crim.App.1993); Roger v. State, 593 So.2d 141 (Ala.Crim.App.1991); Friedman v. State, 654 So.2d 50 (Ala.Crim.App.1994); Bush v. State, 615 So.2d 137 (Ala.Crim.App.1992). Had Mr. Crespi brought this issue before the court he would have established a prima facie case of discrimination based on past conduct by the state’s attorney in using peremptory strikes to eliminate African-Americans from the jury venire. Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987).
“Resentencing counsel was ineffective by failing to argue that the prosecution had a history of using peremptory challenges solely to remove African-American jurors. Resentencing counsel’s deficient performance fell below the objective standard of reasonableness and prejudiced Bryant because Mr. Crespi prevented Bryant from obtaining a fair and impartial jury, and .therefore Bryant should be granted a new trial.... ”
(C. 462-64.)
This claim was clearly not sufficiently pleaded. Bryant alleged -in his petition statistics — the number and percentage of African-Americans struck by the State *1118 and the number and percentage of African-Americans on the venire — and pointed out the Houston County District Attorney’s Office’s history of racial discrimination. See, e.g., Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), aff'd, 24 So.3d 640 (Ala.2009), and the cases cited therein. Although he made a bare allegation that “the State’s statements and questions indicated an intent to discriminate against African-American jurors,” he failed to allege what statements and questions by the State indicated a discriminatory intent. Nor did he allege any facts indicating that the African-Americans struck by the State shared only the characteristic of race, that there was a lack of meaningful voir dire directed at African-American jurors, or that African-American jurors and Caucasian jurors were treated differently. Statistics, even coupled with the Houston County District Attorney’s Office’s history of discrimination, are simply not sufficient to establish a prima facie case of discrimination. See, e.g., Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008).
Therefore, because Bryant failed to plead sufficient facts indicating a prima facie case of racial discrimination in the State’s use of its peremptory strikes, summary dismissal of this claim was proper under Rule 32.7(d).
F.
Bryant also contends that he sufficiently pleaded several additional claims of ineffective assistance of counsel raised in his amended petition. Specifically, Bryant contends that he sufficiently pleaded the following claims:
(1)That Derek Yarbrough was ineffective because he did not have the requisite five years’ experience in trying criminal cases required by § 13A-5-54, Ala.Code 1975;
(2) That Yarbrough’s inexperience resulted in his “ineffectively challenging] the State’s investigation and presentation of its case during the guilt phase of Mr. Bryant’s trial” (Bryant’s brief, at p. 98);
(3) That Yarbrough did not bring to the trial court’s attention or preserve for appellate review “the fact that a juror and a key witness, Sergeant Jim Stanley of the Dothan Police, had contact during trial” (Bryant’s brief, at p. 99);
(4) That trial counsel at his second penalty-phase trial were ineffective for not effectively investigating and presenting mitigating evidence;
(5) That trial counsel at his second penalty-phase trial were ineffective for not challenging “key aspects of the State’s case” (Bryant’s brief, at p. 100);
(6) That counsel on appeal from his second penalty-phase trial were ineffective for not raising on appeal claims of prosecutorial misconduct; and
(7) That counsel on appeal from his second penalty-phase trial were ineffective for not “effectively and adequately challenging] the State’s case on appeal” (Bryant’s brief, at p. 101).
However, Bryant’s argument in this regard fails to satisfy the requirements in Rule 28(a)(10), Ala. R.App. P. Although Bryant makes a cursory argument, previously rejected in Part I.A. of this opinion, that the circuit court applied an improper burden of proof at the pleading stage of the Rule 32 proceedings, he does nothing else but simply state, in cursory fashion, the claims from the petition he believes were sufficiently pleaded with citations to either the page number in the record where the claims are located or to the paragraph numbers in his amended petition wherein the claims are located. He makes no argument regarding why he believes these claims were sufficiently plead *1119 ed nor does he cite to any specific authority in support of his argument that the claims were improperly dismissed — his only citation to authority in this entire portion of his brief is to Strickland, supra. This Court recently addressed a similar issue in Taylor v. State, 157 So.3d 131 (Ala.Crim.App.2010):
“We are aware that application of Rule 28(a)(10) to find a waiver of arguments in an appellate brief has been limited to those cases in which the appellant presents general assertions and propositions of law with few or no citations to relevant legal authority, resulting in an argument consisting of undeli-neated general propositions unsupported by sufficient legal authority or argument. Although Rule 28(a)(10) is to be cautiously applied, it has been applied recently by the Alabama Supreme Court and by this Court when appropriate. E.g., Ex parte Theodorou, 53 So.3d 151 (Ala.2010); Jefferson County Comm’n v. Edwards, 32 So.3d 572 (Ala.2009); Slack v. Stream, 988 So.2d 516 (Ala.2008); James v. State, 61 So.3d 357 (Ala.Crim.App.2006) (opinion on remand from Alabama Supreme Court); Scott v. State, [Ms. CR-06-2233, March 26, 2010] — So.3d - (Ala.Crim.App.2010); Baker v. State, 87 So.3d 587 (Ala.Crim.App.2009); Lee v. State, 44 So.3d 1145 (Ala.Crim.App.2009); Bush v. State, 92 So.3d 121 (Ala.Crim.App.2009); and Franklin v. State, 23 So.3d 694 (Ala.Crim.App.2008).
“In Scott v. State, this Court stated:
“‘“Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.” Hamm v. State, 913 So.2d 460, 486 (Ala.Crim.App.2002). “An appellate court will consider only those issues properly delineated as such and will not search out errors which have not been properly preserved or assigned. This standard has been specifically applied to briefs containing general propositions devoid of delineation and support from authority or argument.” Ex parte Riley, 464 So.2d 92, 94 (Ala.1985) (citations omitted). “When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court’s duty nor its function to perform an appellant’s legal research.” City of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala.1998).’
“Scott v. State, — So.3d at -. See also Hamm v. State, 913 So.2d 460, 486 n. 11 (Ala.Crim.App.2002) (‘Applying the federal counterpart to Alabama’s Rule 28, Ala. R.App. P., the United States Court of Appeals for the Eighth Circuit stated, “[W]e regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities. See United States v. Wadlington, 233 F.3d 1067, 1081 (8th Cir.2000); United States v. Gonzales, 90 F.3d 1363, 1369 (8th Cir.1996); see also United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991) (‘Judges are not like pigs, hunting for truffles buried in briefs.’).” U.S. v. Stuckey, 255 F.3d 528, 531 (8th Cir.2001).’).
“As the State correctly argues in its brief on appeal, many ‘arguments’ in Taylor’s brief consist of little more than a cursory summary of the claims from the petition....
[[Image here]]
“Clearly, Taylor’s cursory summary of the allegations of the petition — with a citation only to the paragraphs of the petition in many arguments of the brief, and in other portions of the brief only to *1120 paragraphs of the petition and undeli-neated general principles of law — does not comport with Rule 28(a)(10). For many of the issues raised in the brief, Taylor presents no discussion of the facts or the law in the form of an argument demonstrating ■ why the circuit court’s dismissal of the-specific claims was in error. Accordingly, we hold that Taylor has waived for purposes of appellate review in this Court those arguments in his brief ... that fail to comply with .the requirements of Rule 28(a)(10).”
157 So.3d at 142-45.
Here, too, we find that Bryant’s cursory summary of the claims in his petition with no specific discussion of the facts or law in the form of an argument as to why he believes thesé claims were improperly summarily dismissed, with only citations to page or paragraph numbers', and with only a single citation to general legal authority is not sufficient to comply -with Rule 28(a)(10). Therefore, those claims of ineffective assistance of counsel set out above are deemed to be waived.
■Moreover, even if Bryant’s brief in this regard did satisfy the requirements in Rule 28(a)(1.0), we have thoroughly reviewed Bryant’s amended petition and we find that all the claims of ineffective assistance of counsel listed above were insufficiently pleaded to satisfy the requirements in Rule 32.3 and Rule 32.6(b) and, thus, summary dismissal' of those claims was proper under Rule 32.7(d).
G.
Finally, we note that Bryant raised several additional ineffeetive-assis-tanee-of-counsel claims in his amended petition that he does not pursue in his brief on appeal. Specifically, Bryant raised the following claims in his amended petition:
(1) That trial counsel at his first trial were ineffective for not attempting to rehabilitate veniremembers who were removed by the trial court during general qualifications;
(2) That trial counsel at his first trial were ineffective for not “tak[ing] exception” to the trial court’s removal of veniremembers from the panel (C. 462);
(3) That trial counsel at his first trial were ineffective for not objecting to the fact that the trial court’s rulings on the challenges for cause were not being included in the record on appeal;
(4) That trial counsel at his first trial were ineffective for not objecting to the trial court’s striking of a veniremember when, he said, that veniremember had been rehabilitated;
(5) That trial counsel at his first trial and at his second penalty-phase trial were ineffective for not properly investigating and retaining a gun-powder-residue expert;
(6) That trial counsel at his first trial and at his second penalty-phase trial were ineffective for not investigating whether Bryant typically carried the type of gun used to kill Hollis;
(7) That trial counsel at his first trial and, at his second penalty-phase trial .were ineffective for not investigating whether Hollis was with a woman at an apartment at the time the police spoke with Bryant outside of Mickey’s nightclub;
(8) That trial counsel at his.first trial and at his second penalty-phase trial were ineffective for not investigating and finding a woman named “Squeaky” who was allegedly with Bryant at the time the police spoke with him outside of Mickey’s nightclub;
(9) That trial counsel at his first trial and at his second penalty-phase trial were ineffective for not investigating *1121 whether Hollis and Brantley were familiar with the neighborhood in which they picked up Bryant, were homosexual, and often “trolled” that neighborhood looking for sexual partners (C. 470);
(10) That trial counsel at his first trial and at his second penalty-phase trial were ineffective for not investigating whether Raymond Mathis was also known as Terry Johnson or whether a Terry Johnson, who, Bryant ■ claimed, lived in Dothan and had an extensive criminal history, was' the person who had shot Hollis;
(11) That trial counsel at his second penalty-phase trial were ineffective for not challenging the trial court’s submis-' sion to the jury of the aggravating circumstance that the murder was committed for pecuniary gain;
(12) That appellate counsel on appeal from his first trial were ineffective for not raising in the motion for a new trial and then on appeal a claim that trial counsel were ineffective; and
(13) That appellate counsel on appeal from his second penalty-phase trial were ineffective for not raising in a motion for a new trial and then on appeal a claim that trial counsel were ineffective.
Because none of these claims are argued by Bryant in his brief on appeal, they are deemed abandoned and will not be considered by this Court. See, e.g., Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995) (“We will not review issues, not listed and argued in brief.”).
III.
Bryant contends that the circuit court erred in summarily dismissing his claim that the. State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not turning over to the defense for. DNA testing the two used condoms found at the scene of Hollis’s murder. He maintains that this claim was sufficiently pleaded in his petition, was meritorious on its face, and entitled him to a new trial.
In his amended petition, Bryant alleged the following with respect to this claim:
“The State also[8] violated Brady by failing to turn over used condoms found at the scene of the crime, so counsel could pursue DNA testing. The first prong of Brady is satisfied because the used eohdoms were not' turned over to trial counsel when he requested them from the police. In fact the police destroyed or lost control of the condoms before the defense had an opportunity to test them. The second prong of Brady is satisfied because the DNA evidence would demonstrate the nature of the activities at the crime scene, indicating consensual sex was the purpose of the visit and not kidnapping as suggested by the prosecution. The third prong of Brady is satisfied because the condoms are a material piece of evidence to show that the victim was not kidnapped or that there was a person other than Bryant at the crime scene at the time of the murder. Finally, the Brady claim is not proeedurally barred because trial counsel never confirmed that evidence was destroyed. The very nature of the claim — .the State’s failure to turn .over .information — implicitly precludes a finding that the claim was available to trial counsel at trial or on appeal. As such, Mr. Bryant’s claim that the State failed *1122 to disclose exculpatory and impeachment evidence in violation of Brady and Giglio [v. United States, 405 U.S. 150 (1972),] is cognizable and should be considered by this Court. To date, Bryant has been denied discovery by this Court; therefore, Bryant cannot confirm or deny the destruction of the condoms.”
(C. 504.)[9]
In its response to Bryant’s amended petition, the State asserted that this claim was precluded by Rule 32.2(a)(3) and (5), Ala. R.Crim. P., because it could have been, but was not, raised and addressed at trial and on appeal. In its order, the circuit court found this claim to be insufficiently pleaded. We agree with both the State and the circuit court.
“To [establish] a Brady violation, a defendant must show that ‘“(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial.’” Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr.App.1992), quoting Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990), cert. denied, Stano v. Singletary, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). See Smith v. State, 675 So.2d 100 (Ala.Cr.App.1995). ‘ “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability is a probability sufficient to undermine confidence in the outcome.’” Johnson, 612 So.2d at 1293, quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).”
Freeman v. State, 722 So.2d 806, 810 (Ala. Crim.App.1998).
However, as this Court explained in Payne v. State, 791 So.2d 383 (Ala.Crim. App.1999):
“Because this Brady claim was first presented in a Rule 32 petition, Payne can obtain relief only if it involves ‘newly discovered evidence.’ Newly discovered evidence is defined under Rule 32.1, Ala. R.Crim. P., as follows:
“ ‘Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:
[[Image here]]
“‘(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:
“‘(1) The facts relied upon were not known by petitioner or petitioner’s counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;
“ ‘(2) The facts are not merely cumulative to other facts that were known;
“ ‘(3) The facts do not merely amount to impeachment evidence;
*1123 “ ‘(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and
“‘(5) The facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received.’
“Rule 32.1(e), Ala. R.Crim. P. We note that because of the conjunctive ‘and’ between (4) and (5), Payne must meet all five prerequisites of Rule 32.1(e), Ala. R.Crim. P., in order to prevail.”
791 So.2d at 397.
Here, Bryant failed to plead sufficient facts indicating that the two used condoms constituted newly discovered evidence under Rule 32.1(e). Indeed, not only did Bryant not even mention Rule 32.1(e) in his amended petition, he admitted in his amended petition that his counsel at his first trial was, in fact, aware of the existence of the two used condoms— he stated in his amended petition that his counsel requested discovery of the condoms. Counsel could not very well request discovery of evidence of which counsel was unaware. A Brady violation involves “the discovery, after trial, of information favorable to the accused that had been known to the prosecution but unknown to the defense.” United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (emphasis added). Contrary to Bryant’s apparent belief, “not turnpng] over” evidence is not the equivalent of suppressing evidence for purposes of Brady.
Because Bryant failed to plead any facts indicating that the two used condoms were unknown to the defense and that they constituted newly discovered evidence obtained after his first trial, this claim is precluded by Rule 32.2(a)(3) and (5) because it could have been, but was not, raised and addressed at trial and on appeal.[10] See Davis v. State, 44 So.3d 1118 (Ala.Crim.App.2009); Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d -(Ala.Crim.App.2009); Smith v. State, 71 So.3d 12 (Ala.Crim.App.2008); Madison v. State, 999 So.2d 561 (Ala.Crim.App.2006); and Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003). Therefore, summary dismissal of this claim was proper under Rule 32.7(d).
IV.
Bryant also contends that the circuit court erred in summarily dismissing his claims of juror misconduct. He argues that his claims were sufficiently pleaded and were meritorious on their face and thus entitled him to an evidentiary hearing. In his amended petition, Bryant raised three claims of juror misconduct; we address each in turn.
A.
First, Bryant alleged that, during voir dire for his first trial, juror J.K, failed to answer questions truthfully. Biyant alleged the following with respect to this claim:
“Bryant’s right to a fair and impartial jury was violated due to a juror’s failure to respond truthfully to questions on voir dire. When a juror fails to truthfully answer questions on voir dire the defendant is deprived of his right to wisely exercise peremptory strikes. Ex parte O’Leary, 438 So.2d 1372, 1373 *1124 (Ala.1983); Ex parte Ledbetter, 404 So.2d 731, 733 (Ala.1981); Tomlin v. State, 695 So.2d 157, 169 (Ala.Crim.App.1996); see also United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir.1984).
“This juror’s failure to respond truthfully to critical questions posed by defense counsel on voir dire violated Bryant’s right to due process and a fair and impartial jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the Alabama Constitution, and Alabama State Law. See Tomlin v. State, 695 So.2d 157, 169 (Ala.Crim.App.1996); McDonough Power Equipment v. Greenwood, 464 U.S. 548, 556 (1984) (finding constitutional violation where jurors deliberately deceive court about a matter which would constitute a valid basis for challenge of juror).
“Juror [J.K.] did not disclose material information on voir dire. During the original trial in 1997, trial counsel asked if any juror had, any connection to law enforcement. While Juror [J.K.] indicated that he knew someone involved in law enforcement, he completely failed to •mention that he was a deputy reserve officer. His failure to reveal that he was a reserve officer prevented Mr. Yar-brough from asking additional questions to uncover whether Juror [J.K.] could1 be impartial in spite, of his background as a reserve deputy. In fact, Juror [J.K.] has had a long history of involvement with law enforcement. Juror [J.K] had applied to the Drug Enforcement Agency and been denied a job and that [sic] this. denial affected him for the rest of his life. Juror [J.K.] was obsessed with law enforcement and clearly .■ could not be an impartial member of the jury. Juror [J.K.] is a police fanatic[,] ■ drives the same make and model as unmarked police cars, keeps numerous police scanners in his car, and follows the police to crime scenes. Juror [J.K.] is clearly someone, who would have advocated law enforcement and possessed potential biases worthy [sic] and tainted the jury with his views. Juror [J.K’s] misconduct was only discovered upon investigation related to Bryant’s Rule 32 Petition.
“The misconduct of the juror deprived Bryant of his constitutional rights, including his right to be tried by an impartial jury and his rights to due process, a fair trial, an impartial jury, equal protection, and a reliable sentencing protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution,- the AlabamConstitution, and Alabama law.”
(C. 505-06.)[11]
This claim was not sufficiently pleaded. Although Bryant-alleged that J.K. failed to mention that he “was a deputy reserve officer” when the question was asked whether any juror had any connection to law enforcement, Bryant failed to allege exactly when J.K. was a deputy reserve officer, i.e., whether J.K. was a reserve officer at the time of Bryant’s trial or at some point in his past. The fact that J.K. may have been a reserve officer at some point in his past does not .necessarily constitute the failure to answer truthfully the question as phrased by Bryant in his petition. Bryant' alleged in his amended petition only generally that counsel asked “if any juror had any connection to law en *1125 forcement.”[12] However, he failed to plead exactly.what the question was that he believed was not answered truthfully by J.K. The question allegedly propounded by counsel — as phrased by Bryant in his amended petition — was ambiguous, at best, regarding the timing of the juror’s “connection” to law enforcement, i.e., whether counsel wanted to know if any juror had any connection to law enforcement at the time of the trial or whether counsel wanted to know if any juror had any connection at any point in their lives. In examining a juror-misconduct claim based on a juror’s failure to answer questions truthfully, the phrasing of the exact question asked is critical. Bryant’s bare pleadings are simply not sufficient to indicate that J.K. failed to answer truthfully during-voir dire.
In addition, even assuming Bryant’s pleadings were sufficient to establish that J.K. failed to answer truthfully during voir dire, Bryant failed to plead sufficient facts indicating prejudice. In Hooks v. State, 21 So.3d 772 (Ala.Crim.App.2008), this Court explained:
“To prevail on a claim of juror misconduct, the petitioner must establish that he ‘might have been prejudiced’ by the jurors’ failure to respond truthfully to a question posed on voir dire. See Ex parte Stewart, 659 So.2d 122 (Ala.1993).
“‘It is true that the parties in a case are entitled' to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So.2d 1253 (Ala.1988). However, not every failuie to respond properly to questions propounded during voir dire “automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.” Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970); see also Dawson v. State, [710 So.2d 472] at 474 [ (Ala.1997) ]; and Reed v. State, [547 So.2d 596 (Ala.1989) ]. As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is “whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.” Ex parte Stewart, 659 So.2d [122] at 124 [(Ala.1993)]. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion.’
“Ex parte Dobyne, 805 So.2d 763, 771-72 (Ala.2001) (footnote omitted).”
21 So.3d at 780-81. The might-have-been-prejudiced standard, although on its face a light standard, actually requires more than simply showing that juror misconduct occurred. “[T]he question whether the jury’s decision might have been affected is answered not by a bare' showing of juror misconduct, but rather by an examination of the circumstances particular to the case.” Ex parte Apicella, 809 So.2d 865, 871 (Ala.2001). Thus, “[i]n. applying this standard we look at ‘the temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvertence or willfulness in falsifying or in failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.’ ” *1126 Hooks, 21 So.3d at 781 (quoting DeBruce v. State, 890 So.2d 1068, 1078 (Ala.Crim.App.2003), overruled on other grounds, Ex parte Jenkins, 972 So.2d 159 (Ala.2005)).
Here, although the matter inquired about — the jurors’ connection to law enforcement — is material, as noted above, the question propounded (as phrased by-Bryant in his amended petition) was ambiguous, Bryant failed to plead any facts indicating the period of J.K’s reserve-deputy status, and Bryant made no allegation whatsoever that J.K.’s failure to reveal his reserve-deputy status was in any way willful or intentional. Under these circumstances, we simply cannot say that this claim satisfies the pleading requirements in Rule 32.3 and Rule 32.6(b). Therefore, summary dismissal of this claim was proper under Rule 32.7(d).
B.
Second, Bryant argued that, during deliberations at his second penalty-phase trial, the jury foreman coerced the jury into voting for death by insinuating that by casting any other vote the jurors would be violating the law. Bryant alleged the following with respect to this claim:
“The coercion of jurors by the juror foreperson during the sentencing phase of Bryant’s trial violated Bryant’s right to due process and a fair and impartial jury as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the Alabama Constitution, and Alabama law. See Hallmark v. Allison, 451 So.2d 270, 271-72 (Ala.1984); Clark-Mobile [Clarke-Mobile] Counties Gas Dist. v. Reeves, 628 So.2d 368, 370 (Ala.1993); Ala. Const. Art. I, § 6; see also Ala.Code § 15-17-5(a)(2) (establishing jury misconduct as a ground for granting a motion for a new trial in criminal cases).
“A juror misconduct claim is cognizable where the misconduct ‘might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered.’ Roan v. State [225 Ala.428], 143 So.2d 454, 460 (Ala.1932); Ex Parte Troha, 462 So.2d 953, 954 (Ala.1984). Even in circumstances in which the evidence is ambiguous, it sufficiently supports this ‘light’ burden. Troha, 462 So.2d at 954. If a showing is made that the verdict might have been affected by the misconduct, the misconduct need not have actually controlled or dominated the jury’s verdict. See Holland v. State, 588 So.2d 543, 549 (Ala.Crim.App.1991).
“There were several instances of juror misconduct that occurred during Bryant’s resentencing trial. First, there is evidence that the jury foreperson coerced other members of the jury to vote for death. At the beginning of jury deliberations, one woman indicated that she could not vote to put Bryant to death. The jury foreperson responded to her and stated that during jury voir dire she had indicated that she would be able to impose the death penalty, in spite of her religious beliefs. The foreperson went on to say that either the juror was lying now or had lied to the prosecutor, which was against the law. The foreperson’s coercive manner caused a second juror on the panel to believe that a vote against the death penalty was against the law, thereby prompting that juror to vote for death, when in fact that juror did not want to give Bryant a death sentence.”
(C. 507-08.)
 This claim fails to state a material issue of fact or law upon which relief could be granted. It is well settled that “matters that the jurors bring up in their deliberations are simply not improper un *1127 der Alabama law, because the law protects debates and discussions of jurors and statements they make while deliberating their decision.” Sharrief v. Gerlach, 798 So.2d 646, 653 (Ala.2001). “Rule 606(b), Ala. R. Evid., recognizes the important ‘distinction, under Alabama law, between “extraneous facts,” the consideration of which by a jury or jurors may be sufficient to impeach a verdict, and the “debates and discussions of the jury,” which are protected from inquiry.’ ” Jackson v. State, 133 So.3d 420, 431 (Ala.Crim.App.2009) (quoting Shanief, supra at 652). “[T]he debates and discussions of the jury, without regard to their propriety or lack thereof, are not extraneous facts.” Sharrief, 798 So.2d at 653. Thus, “affidavits or testimony] showing that extraneous facts influenced the jury’s deliberations [are] admissible; however, affidavits concerning ‘the debates and discussions of the case by the jury while deliberating thereon’ do not fall within this exception.” CSX Transp., Inc. v. Dansby, 659 So.2d 35, 41 (Ala.1995) (quoting Alabama Poiver Co. v. Turner, 575 So.2d 551, 557 (Ala.1991)). In terms of this claim of juror misconduct, the allegedly coercive statements made by the jury foreperson and the impact those statements may have had on the jury in its deliberations are not extraneous facts. Therefore, they are insulated from inquiry and cannot form the basis of a valid claim for relief under Rule 32.
As this Court noted in addressing' a similar issue in Jones v. State, 753 So.2d 1174 (Ala.Crim.App.1999):
“[W]e reject Jones’s claim that his ‘death sentence was the result of coercive influences brought into the jury deliberations which were outside the scope of the evidence and judicial control.’ (Appellant’s brief at p. 97.) Specifically, he argues that a juror’s statement that ‘if we give him life that maybe in a few years that he would be up for parole’ improperly persuaded others to sentence him to death. (R. 275-76.)
“Testimony at the Rule 32 hearing indicated that before reaching its 12-0 advisory verdict recommending a sentence of death, the jury voted several times. Several ballots resulted in a 10-2 determination to recommend death. One of the two individuals who initially voted against death testified that she changed her vote in favor of death after J.M. made the statement regarding parole.
“ ‘A juror cannot impeach his verdict by later explaining why or how the juror arrived at his or her decision.’ Adair v. State, 641 So.2d 309, 313 (Ala.Cr.App.1993).
“Moreover, Rule 606(b), Ala. R. Evid., provides, in pertinent part:
“ ‘Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment , as to any matter or statement occurring during the course of the jury’s deliberations or the effect of anything upon that or any other juror’s mind or emotions as influencing the juror as to assent to or dissent from the verdict or indictment or concerning the juror’s mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror’s affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.’
“We find no. merit to Jones’s claim because it was based on prohibited testi *1128 mony. A consideration of the .claim would destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny. See Ex parte Neal, 731 So.2d 621 (Ala.1999); and Barbour v. State, 673 So.2d 461, 469-470 (Ala.Cr.App.1994), aff'd, 673 So.2d 473 (Ala.199.5), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996).”
753 So.2d at 1203-04 (footnote omitted). Similarly, here, a consideration of this claim of juror misconduct — which is based entirely on the debate and deliberations of the jury — "would destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testim'ony after trial, and. discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny.” 753 So.2d at 1204. Therefore, this claim fails to state a material issue of fact or law upon which relief could be granted, and summary dismissal- was proper under Rule 32.7(d).[13]
C.
Finally, Bryant argued that, during deliberations at his second penalty-phase trial, the jury foreman informed the jury of extraneous facts, specifically that the trial court had previously sentenced Bryant to death for his capital-murder conviction^, which, Bryant claimed, unlawfully' influenced the jury’s sentencing verdict. Bryant alleged the following with respect to this claim:
“Second, it is clear that this same foreperson brought .extraneous information into the jury deliberations. This information related to Bryant’s previous trial, and the foreperson used this information to coerce reluctant jurors to vote •for death; The 'foreperson indicated that Bryant’s death sentence was a foregone conclusion because Judge Jackson had previously sentenced Bryant to death. The foreperson- should not have known about Bryant’s previous death sentence and the jury certainly should not have considered this incredibly prejudicial information during deliberations.
“This is significant because in making the decision to impose the death penalty, the jury acts as a unit. See Ex parte McNabb, 887 So.2d 998, 1006 (Ala.2004). Thus[,] the misconduct of one of its members cannot be segregated. The prejudicial atmosphere created by the misconduct of even one juror is impossible to eradicate and injuriously affected the substantial rights of the defendant. See Holland, 588 So.2d at 547.”
(C. 508.)
This:claim was not sufficiently pleaded. Although Bryant alleged. that the jury-foreperson informed- the jurors of extraneous information- — that Bryant had previously been sentenced to death based on earlier capital-murder- convictions — he made nothing more than a bare allegation that this information “coerce[d]. reluctant jurors to vote for death.” He failed to assert how many allegedly “reluctant jurors” were on.the jury, what the vote of .the jury was in relation to the. death sentence, or even to name a single juror who he believe^ was “reluctant” to vote for death but who nonetheless voted for death *1129 based on the extraneous information. Therefore, he failed to satisfy the pleading requirements in Rule 32.3 and -Rule 32.6(b), and summary dismissal of- this claim was proper under Rule 32.7(d).
V.
Finally, Bryant contends that the circuit court also erred in summarily dismissing several of the substantive claims for relief in his amended petition. (Issues V.B.V.F. in Bryant’s brief.) Specifically, Bryant argues that the circuit court erred in summarily dismissing the following claims:
(1) That he was denied his right to a fair trial at his - second penalty-phase trial as a result of prosecutorial misconduct;
(2) That he was denied his right to confrontation at his second penalty-phase trial as a result of Ricky-Vickers’s absence;
(3) That he was denied -his right to counsel when he was allegedly questioned by police after he had asked for an attorney;
(4) That the State violated Batson v. Kentucky, 476 U.S. 79 (1986), at his second penalty-phase-trial; and
(5) That Alabama’s method of execution constitutes cruel and unusual punishment.[14]
Bryant argues that these claims in his. amended petition were sufficiently pleaded and meritorious on their 'face and thus entitled him to an evidentiary hearing.
We find it unnecessary to address whether these claims were sufficiently pleaded under Rule 32.3 and Rule 32.6(b) because we agree with the State’s argument in its response to Bryant’s petition, and in its brief on appeal, that these claims were precluded by various provisions in Rule 32.2. Specifically, claims (1) and (3), as set out above, are precluded by Rule 32.2(a)(5), because they could have been, but were not, raised and addressed on appeal,- and claims (2), (4), and (5), as set out above, -are precluded by Rule 32.2(a)(4), because they were raised and addressed on appeal. Therefore, summary dismissal of these claims-was proper under Rule 32.7(d).
VI.
For the réasons stated above,- we remand this case to the circuit court for it to afford Bryant the opportunity to present evidence at an evidentiary hearing to support the following claims in his petition: (1) that trial counsel at his first trial were ineffective for not properly investigating and retaining a blood-spatter expert and a DNA expert, as set out in P'art II.B. of this opinion; (2) that trial counsel at his first trial were ineffective for not properly investigating and presenting evidence to support a motion to suppress the first statement he made to police, as set out in Part II.C.' of this opinion; and(3) that trial counsel'át his first trial and trial counsel at his second penalty-phase trial were ineffective for failing to adequately impeach Ricky Vickers’s testimony and that trial counsel at his second penalty-phase trial were-ineffective for failing to adequately challenge ■ Vickers’s unavailability, as set out in Part ILD. of this opinion.
Because Bryant is entitled to an eviden-tiary' hearing on these claims, he may also be entitled to discovery relating to these claims. Therefore, pn remand, the circuit *1130 court shall reevaluate its denial of Bryant’s discovery request as it relates to the above-listed claims,[15] and it may grant whatever discovery it deems necessary for a" proper resolution of these claims. In this regard, we point out that postconvietion discovery is not prohibited—as the-circuit court’s notation on the case-action summary denying Bryant’s discovery request appears to suggest—but, rather, is governed by the good-cause standard set-out by the Alabama Supreme Court in Ex parte Land, 775 So.2d 847 (Ala.2000), as follows:
“We agree with the Court of Criminal Appeals that ‘good cause’ is the appropriate standard by which to judge post-conviction discovery motions. In fact, other -courts' have adopted a similar ‘good-cause’ or ‘good-reason’ standard for the.postconviction discovery process. See [State v.] Marshall, [148 N.J. 89, 690 A.2d 1 (1997)]; State v. Lewis, 656 So.2d 1248 (Fla.1994); People ex rel. Daley v. Fitzgerald, 123 Ill.2d 175, 121 Ill.Dec. 937, 526 N.E.2d 131 (1988). As noted by the Illinois Supreme Court, the good-cause standard guards against .potential abuse of the postconviction discovery process. . See Fitzgerald, supra, 123 Ill.2d at 183, 121 Ill.Dec. 937, 526 N.E.2d at 135. We also agree that New Jersey’s Marshall case provides a good, working framework for reviewing discovery motions and orders in capital cases. In addition, we are bound by our ■own rule that ‘an evidentiary hearing must be held on a [petition for postcon-viction relief] which is meritorious on its face, i.e., one which contains matters and allegations (such as ineffective assis-tánce of counsel) which, if true, entitle the petitioner -to relief.’ Ex parte Boatwright, 471 So.2d 1257, 1258 (Ala.1985).
“We emphasize' that this holding— that postconviction discovery motions are to be judged by a good-cause standard—does not automatically allow discovery -under Rule 32, Ala. R.Crim. P., and that it does not expand the discovery procedures within Rule 32.4. Accord Lewis, supra, 656 So.2d-at 1250, wherein the Florida Supreme Court stated that the good-cause standard did not affect Florida’s rules relating to postconviction procedure, which are similar to ours. By adopting this standard, we are only recognizing that a trial court, upon a petitioner’s showing .of good cause, may exercise its inherent authority to order discovery in a proceeding for postconviction relief....”
775 So.2d at 852 (footnote omitted).
The circuit court shall also issue specific written findings of fact regarding each of the above-listed claims in accordance with Rule 32.9(d), Ala. R.Crim. P., and it may grant Bryant whatever relief it deems necessary. Due return shall be filed with this Court within 180 days of the date of this opinion and shall include the circuit court’s written findings of fact, a transcript of the evidentiary hearing, and any other evidence received or relied on by the court on remand.
Based on the foregoing, this cause is remanded to the circuit court for proceedings consistent with this opinion.
REMANDED WITH DIRECTIONS. 
*1131 WELCH, P.J., concurs.
WINDOM, J., concurs in the result.

On Return to Second Remand

KELLUM, Judge.
Jerry Devane Bryant was convicted in 1998 of the murder of Donald Hollis made capital because it was committed during the course of a kidnapping, see § 13A-5-40(a)(1), Ala.Code 1975, and was sentenced to death. This Court affirmed Bryant’s conviction and sentence on appeal. See Bryant v. State, 951 So.2d 702 (Ala.Crim.App.1999) (“Bryant I ”). The Alabama Supreme Court also affirmed Bryant’s conviction, but it reversed his death sentence and remanded the case for a new penalty-phase trial. See Ex parte Bryant, 951 So.2d 724 (Ala.2002) (“Bryant II ”), on remand, Bryant v. State, 951 So.2d 732 (Ala.Crim.App.2003). After a second penalty-phase trial, Bryant was again sentenced to death, and this Court affirmed his sentence. See Bryant v. State, 951 So.2d 732, 737 (Ala.Crim.App.2003) (opinion on return to remand) (“Bryant III ”). The Alabama Supreme Court denied certiorari review, and this Court issued a certificate of judgment on September 29, 2006.
Bryant timely filed a Rule 32, Ala. R.Crim. P., petition for postconviction relief on September 26, 2007, raising numerous claims, including several claims of ineffective assistance of counsel. He filed an amended petition on March 21, 2008 (hereinafter “first amended petition”), in which he reasserted the claims raised in his original petition and raised additional claims as well. Bryant also filed a discovery motion, which the circuit court' denied. After the State filed an answer and motion to dismiss the first amended petition and Bryant filed a reply to the State’s answer and motion to dismiss, the circuit court summarily dismissed Bryant’s first amended petition by written order on October 27, 2008.
On appeal, this Court held that the circuit court had properly summarily dismissed the majority of the claims in Bryant’s first amended petition; however, we remanded this case for the circuit court to allow Bryant an opportunity to present evidence to prove the following claims of ineffective assistance of counsel, which we held were sufficiently pleaded and facially meritorious: (1) that trial counsel at his first trial were ineffective for not properly investigating and retaining a blood-spatter expert and a DNA expert; (2) that trial counsel at his first trial were ineffective for not properly investigating and presenting evidence to support a motion to suppress the first statement he made to police; and (3) that trial counsel at his first trial and trial counsel at his second penalty-phase trial were ineffective for failing to adequately impeach Ricky Vickers’s testimony and that trial counsel at his second penalty-phase trial werp ■ ineffective for failing to adequately challenge Vickers’s unavailability. See Bryant v. State, 181 So.3d 1087 (Ala.Crim.App.2011) (“Bryant IV”). We also ordered the circuit court to reconsider its denial of Bryant’s discovery request as it related to the above-listed claims.
, After the case was remanded, Bryant filed two additional requests for discovery, both of which were denied by the circuit court. Bryant then filed a second amended Rule 32 petition, in which he added additional facts and arguments to several of the claims from his first amended petition, including those claims for which this Court had remanded this case as well as some of the claims that this Court had held had already been properly dismissed. The *1132 circuit court issued an order on December 28, 2011, striking the second amended petition. On March 1, 2012, the circuit court conducted an evidentiary hearing on the claims of ineffective assistance of counsel listed above, and on October 23, 2012, after the parties had filed post-hearing briefs, the circuit court issued an order denying those claims. We permitted the parties to file briefs on. return to remand and heard oral argument on the issues.
On return to remand, this Court remanded this case a second time for the circuit court to reconsider the claim in Bryant’s first amended petition that his trial counsel at his second penalty-phase trial were ineffective for failing to adequately impeach Ricky Vickers’s testimony and to issue specific findings of fact regarding that claim. The circuit court complied with this .Court’s instructions and submitted its return to second remand on May 29, 2014. We permitted the parties to file additional briefs on return to second remand.
The facts of the crime are fully set out in our opinions in Bryant I and Bryant IV and need not be repeated here.

Standard of Review

“ 'The burden of proof in a Rule 32 proceeding rests solely with the petitioner, not the State.’ Davis v. State, 9 So.3d 514, 519 (Ala.Crim.App.2006), rev’d on other grounds, 9 So.3d 537 (Ala.2007). ‘[I]n a Rule 32, Ala. R.Crim. P., proceeding, the burden of proof is upon the petitioner seeking post-conviction relief to establish his grounds for relief by a preponderance of the evidence.’ Wilson v. State, 644 So.2d 1326, 1328 (Ala.Crim.App.1994). Rule 32.3, Ala. R.Crim. P., specifically provides that ‘[t]he petitioner shall have the burden of ... proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.’ ”
Wilkerson v. State, 70 So.3d 442, 451 (Ala.Crim.App.2011).
“[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). Also, “where a trial court does not receive evidence ore tenus, but instead makes its judgment based on' the plead ings, exhibits, and briefs, ... it is the duty of the appellate court to judge the evidence de novo.” Ex parte Horn, 718 So.2d 694, 705 (Ala.1998). Likewise, when a trial court makes its judgment “based on the cold trial record,” the appellate court must review the evidence de novo. Ex parte Hinton, 172 So.3d 348, 353 (Ala.2012).
“However, where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, ‘[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.’ ” Boyd v. State, 913 So.2d 1113, 1122 (Ala.Crim.App.2003) (quoting Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992)). “When conflicting evidence is presented ... a presumption of correctness is applied to the court’s factual determinations.” State v, Hamlet, 913 So.2d 493, 497 (Ala.Crim.App.2005). This is true “whéther the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence.” Parker Towing Co. v. Triangle Aggregates, Inc., 143 So.3d 159, 166 (Ala.2013) (citations omitted). “The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses.” Hope v. State, 521 So.2d 1383, 1387 (Ala.Crim.App.1988). Indeed, it is well settled that, in order to *1133 be entitled to relief, a postconviction “petitioner must convince the trial judge of the truth of his allegation and the judge must ‘believe’ the testimony.” Summers v. State, 366 So.2d 336, 343 (Ala.Crim.App.1978). See also Seibert v. State, 343 So.2d 788, 790 (Ala.1977).
I.
We first reconsider one of the claims from Bryant’s first amended petition that this Court previously held was properly summarily dismissed — the claim that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not turning over to the defense for DNA testing two used condoms found at the scene of Hollis’s murder. In Bryant IV, relying on Payne v. State, 791 So.2d 383, 397 (Ala.Crim.App.1999), this Court held, in part, that Bryant had failed to plead sufficient facts in his petition indicating that the two used condoms constituted newly discovered material facts under Rule 32.1(e), Ala. R.Crim. P., and that, therefore, summary dismissal of this claim was proper. After our opinion in Bryant IV was released, the Alabama Supreme Court issued its decision in Ex parte Beckworth, [Ms. 1091780, July 3, 2013] — So.3d-(Ala.2013), in which that Court held that a Brady claim may be raised under Rule 32.1(a), Ala. R.Crim. P., in which ease the petitioner would not be required to meet the requirements for establishing newly discovered material facts under Rule 32.1(e).
A review of Bryant’s first amended petition indicates that he raised his Brady claim under Rule 32.1(a), not under Rule 32.1(e); therefore, our . analysis of Bryant’s Brady claim, under the. premise that the claim asserted the existence .of newly discovered material facts was in error based on the Alabama Supreme Court’s recent holding in Ex parte Beck-worth. However, after again reviewing the claim, we find that our ultimate conclusion that the claim was precluded by Rules 32.2(a)(3)- and (a)(5) was nonetheless correct.[1]
“To [establish] a Brady violation, a defendant must show that ‘ “(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial.’” Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr.App.1992), quoting Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990), cert. denied, Stano v. Singletary, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). See Smith v. State, 675 So.2d 100 (Ala.Cr.App.1995). ‘ “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.”’ Johnson, 612 So.2d at 1293, quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).”
Freeman v. State, 722 So.2d 806, 810 (Ala.Crim.App.1998). However, “‘the rule of Brady applies only in situations which involve “discovery after trial of information which had been known to the prosecution but unknown to the defense.” * ” Bates v. State, 549 So.2d 601, 609 (Ala.Crim.App. *1134 1989) (quoting Gardner v. State, 530 So.2d 250, 256 (Ala.Crim.App.1987), quoting in turn United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)) (some emphasis added).
Although Bryant did not have to allege in his petition sufficient facts indicating that the two used condoms constituted newly discovered material facts under Rule 32.1(e), he did have to allege in his petition sufficient facts indicating that the two used condoms were unknown to the defense and were discovered only after his trial, two necessary requirements to establish a Brady violation. Not only did Bryant fail to plead such facts, he admitted in his first amended petition that the existence of the two used condoms was, in fact, known by the defense at the time of trial.[2] As we stated in Bryant TV, Bryant
“admitted in his [first] amended petition that his counsel at his first trial was, in fact, aware of the existence of the two used condoms — he stated in his [first] amended petition that his counsel requested discovery of the condoms. Counsel could not very well request discovery of evidence of which counsel was unaware.... Contrary to Bryant’s apparent belief, ‘not turnfing] over’ evidence is not the equivalent of suppressing evidence for purposes of Brady.”
181 So.3d at 1123. Based on Bryant’s admission . in his first amended petition that his counsel were aware of the two used condoms at the time of trial, and that counsel even requested discovery of those condoms, it is clear that Bryant’s Brady claim was precluded by Rules 32.2(a)(3) and (a)(5) because it could have been, but was not, raised and addressed at trial and on appeal. Therefore, we again conclude that summary dismissal of this claim in Bryant’s first amended petition was proper.
II.
Bryant contends on return to remand that the circuit court denied him “an adequate opportunity to present evidence to support the remanded claims.” (Bryant’s brief on return to remand (“RTR brief’), p. 15.) He makes two arguments in this regard; we address each in turn.
A.
Bryant argues that the circuit court erred in striking his second amended petition filed after remand. Relying on Ex parte Apicella, 87 So.3d 1150 (Ala.2011), Bryant argues that when the Court of Criminal Appeals “reverses and remands the case for an evidentiary hearing, there is no jurisdictional bar to amending the Rule 32 petition.” (Bryant’s RTR brief, p. 30.) He further argues that preventing him from amending his petition to add new factual allegations to support his claims “is contrary to Rule 32’s liberal amendment policy.” (Bryant’s RTR brief, p. 31.) Finally, he argues that, by refusing to allow him to amend his petition, the circuit court “took an overly narrow view” of his claims that “failed to comply with [this Court’s] mandate according to its true intent and meaning.” (Bryant’s RTR brief, pp. 31-33.) We disagree.
Bryant’s reliance on Ex parte Apicella is misplaced.' After being convicted of capital murder and sentenced to death, Andrew Anthony Apicella filed a Rule 32, Ala. R.Crim. P., petition for postconviction relief, followed by an amended petition and a second amended petition. The circuit court summarily dismissed the second amended petition. On appeal, this Court *1135 reversed the circuit court’s summary dismissal of the second amended petition and remanded the case for the circuit court to conduct an evidentiary hearing on one of the claims in Apicella’s second amended petition. See Apicella v. State, 945 So.2d 485 (Ala.Crim.App.2006) (“Apicella I”). On remand, Apicella attempted to file a third amended petition, but the circuit court struck that petition. The circuit court then denied Apicella’s second amended petition, and Apicella appealed. On appeal, this Court affirmed, by unpublished memorandum, the circuit court’s judgment, holding, in part, that the striking of Apicella’s third amended petition on the ground that the third amended petition had been filed after the circuit court’s judgment, i.e., after the circuit court had summarily dismissed Apicella’s second amended petition, was appropriate. See Apicella v. State (No. CR-06-1059), 77 So.3d 624 (Ala.Crim.App.2010) (table) (“Apicella II”). The Alabama Supreme Court reversed this Court’s judgment, holding:
“In December 2004, the trial court did enter a judgment summarily dismissing Apicella’s second amended Rule 32 petition. However, in Apicella [I ], the Court of Criminal Appeals ‘reverse[d] the trial court’s summary' dismissal of Apicella’s petition ... and ... remandad] the cause for further proceedings.’ 945 So.2d at 491. ‘Reversal of a judgment and remanding of the cause restores both the State and the defendant to the condition in which they stood before the judgment was pronounced.’ Knight v. State, 356 So.2d 765, 767 (Ala.Crim.App.1978). See also City of Hampton v. Iowa Civil Rights Comm’n, 554 N.W.2d 532, 535 (Iowa 1996) (‘Unless the remand limits the issues to be considered, the case should be reviewed in its entirety.’).”
Ex parte Apicella, 87 So.3d at 1154. Because this Court’s reversal of the circuit court’s judgment summarily dismissing the second amended petition had the effect of setting aside that judgment, there was no judgment in effect at the time Apicella filed his third amended petition. Therefore, the Supreme 'Court concluded, the circuit court erred in striking the third amended petition ón the ground that it had been filed after entry of judgment.
In this case, however, unlike Ex parte Apicella, this Court did not reverse the circuit court’s judgment summarily dismissing Bryant’s first amended petition. Rather, this Court only remanded the case for further proceedings. By remanding the case, instead of reversing and remanding, this Court, contrary to Bryant’s belief, left intact the circuit court’s October 27, 2008, summary dismissal of his first amended petition. Bryant’s argument in his reply brief ,on return to remand that there is no “meaningful distinction” between remanding a case and reversing and remanding a case (Bryant’s reply brief on return to remand (“RTR reply brief’), p. 11), is clearly meritless because it is that very distinction that formed the basis for the Alabama Supreme Court’s opinion in Ex parte Apicella. See Ex parte Apicella, 87 So.3d at 1154 (noting that although this Court had stated in Apicella II that this Court had erred in reversing the judgment in Apicella I instead of simply remanding with directions, the judgment in Apicella I was nonetheless “unambiguous, and its effect cannot be ignored”). .Therefore, because this Court’s remand in this case did not set aside the circuit court’s October 27, 2008, summary dismissal of Bryant’s first amended petition, Bryant’s second amended petition was clearly' untimely, having been filed after entry of judgment, and was properly stricken by the circuit court. See Rule 32.7(b), Ala, R.Crim. P. (“Amendments to pleadings may be permitted at *1136 any stage of the proceedings prior to the entry of judgment.” (emphasis added)).
. Moreover, the striking of Bryant’s second amended petition was not contrary to “Rule 32’s liberal amendment policy,” as Bryant contends, because although amendments to Rule 32 petitions are to be freely granted, that general rule applies only to amendments timely filed before judgment is entered. Because Bryant’s second amended petition was untimely filed after entry of judgment, the circuit court properly refused to consider it.
Finally, we have thoroughly- reviewed the record on return to remand and it is clear to us that the circüit court did not, as Bryant contends, take “an overly narrow view” of his claims contrary to the “true intent and meaning” of this Court’s opinion in Bryant IV. Rather, as the circuit court noted in its order on remand: Bryant “has attempted to amend his Rule 32'petition and otherwise boot strap a multitude of other claims of ineffective assistance of counsel onto those three narrow issues” that “[t]his Court was assigned to review” bn remand. (Record on Return to Remand (“RTR”), C. 1338.) On remand in the circuit court, Bryant argued, incorrectly, that the claims for which we remanded this case were' much broader than they actually were, and he attempted to change the factual basis for those claims in his second amended petition, at the evidentia-ry hearing, and again in his post-hearing brief. However,' as the circuit court correctly determined, this Court remanded this case for further proceedings on three very narrow and specific claims of ineffective assistance of counsel[3] and to reconsider its denial of Bryant’s discovery request as it related to those specific claims.
As this Court noted in Bryant IV:
“‘“Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.” Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion “which, if true, entitled] the petitioner to relief.” Lancaster v. State, 638 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation oí facts in pleading which, if true, entitle[s] a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then'entitled to an opportu'nity,' as provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those alleged facts.’ ”
181 So.3d at 1101 (quoting Boyd v. State, 913 So.2d 1113, 1125 (Ala.Crim.App.2003)). In Bryant IV, we found that Bryant had pleaded sufficient facts that, if true, would entitle him to relief on the three claims of ineffective assistance of counsel set out previously. Thus, we remanded this case to give Bryant an opportunity to present evidence to prove the specific facts he had alleged in his first amended petition. in support of those three claims of ineffective assistance of counsel. This Court’s remand order did not permit Bryant to allege new and additional facts to support those three claims, or to raise new or different claims and, indeed, the circuit court had no authority to go beyond this Court’s remand order and to consider additional factual allegations or new claims of ineffective assistance of counsel because “any act by a trial court beyond the scope of an appellate court’s remand order is void for lack of jurisdiction.” Anderson v. *1137 State, 796 So.2d 1151, 1156 (Ala.Crim.App.2000) (opinion on return to remand).
For these reasons, we conclude that the circuit court properly struck Bryant’s second amended petition. Moreover, ' we point out that because Bryant’s second amended petition was properly struck by the circuit court, for purposes of this opinion, we do not consider any of the additional factual allegations or new claims raised in the second amended petition; we consider only those factual allegations supporting the three claims of ineffective assistance of counsel for which we remanded this case that were included in Bryant’s first amended petition. Nor do we consider or address "any of Bryant’s arguments in his brief on return to remand that are based on the additional factual allegations or claims that Bryant untimely raised for the first time in his second amended petition, at the evidentiary hearing, or in his post-hearing brief. Because those additional factual allegations and claims were not properly before the circuit court for review on remand, they- are likewise not properly before this Court on return to remand.
B.
Bryant also argues that the circuit court erred in denying his discovery requests on remand. He argues that the circuit court’s denial of his requests prevented him from “fully presenting” his claims to the circuit court and “severely undermined” his ability to prove his claims of ineffective assistance of counsel,[4] (Bryant’s RTR brief, p. 25.)
As noted above, in remanding this case, this Court instructed the circuit court to reconsider its denial of Bryant’s discovery motion as it related to the three specific claims of ineffective assistance for which this Court remanded the case for further proceedings. After we remanded this case, Bryant filed an amended discovery motion, requesting discovery of a laundry list of items. The State filed a response to the motion, in. which it indicated that it did not, object to Bryant’s being provided with the Houston County District Attorney’s file, with the exception of any work product; to Bryant’s viewing any of the physical evidence that had been introduced at his trial as long as the evidence remained in the possession of the circuit clerk and was not tested or altered in any way; and to Bryant’s being provided with a tape recording of his January 30, 1997, statement to police. The State argued, however, that Bryant had failed to establish good cause for discovery of the remaining items Bryant' had requested. The circuit court conducted á hearing on the amended discovery motion on April 13, 2011, at which the parties presented argument. Following the hearing, the circuit court issued ah order denying the majority of Bryant’s requested discovery on the ground that Bryant had failed to show good cause. The court, however, ordered that the State provide a copy of all materials contained in the district attorney’s files that had been *1138 provided to trial counsel before Bryant’s trial.
After receiving the materials from the district attorney’s file, Bryant filed a supplemental motion for discovery in which Bryant requested discovery of even more items than he did in his amended discovery motion. Bryant attached to his supplemental motion a 7-page 'spreadsheet listing 53 categories of evidence[5] that he wanted as part of discovery. For each category, Bryant listed the volume and page number of the trial record where the evidence was introduced or referred to, the claim to which Bryant alleged the evidence was relevant, and a short explanation of why Bryant believed the evidence was necessary to prove his claims. In its response to the supplemental motion, the State argued that the spreadsheet effectively listed “every single document or piece of physical evidence that was ever mentioned or referenced during trial relating to the investigation of the crime.” (RTR, C. 758.) On August 30, 2011, the circuit court issued an order denying the supplemental discovery motion. However, on December 19, 2011, the circuit court issued an order granting Bryant access “to the entire court file in this matter for the purposes of copying and photographing items therein” as well as access “to examine and copy all paper records, photographs, trial exhibits and videotapes.” (RTR, C. 939.) The court specifically stated in the order that Bryant could “touch any items in the court file as is reasonably necessary” but that he could not “manipulate, test, or remove from the Houston County Clerk’s Office any items in the court file without receiving prior written agreement from the State.” (RTR, C. 939.)
Although on remand Bryant requested discovery of, essentially, every document and every piece of physical evidence related to Hollis’s murder, in his brief on return to remand Bryant mentions only a few items that he believes he should have received in discovery. It is well settled that this Court “will not review issues not listed and argued in brief.” Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). “ ‘[Allegations ... not expressly argued on ... appeal.... are deemed by us to be abandoned.’ ” Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991) (quoting United States v. Burroughs, 650 F.2d 595, 598 (5th Cir.1981)). By mentioning only a few items in his brief on return to remand, Bryant has abandoned any argument regarding the remaining evidence of which he requested discovery in the circuit court, and we address the propriety of the circuit court’s denial of Bryant’s requested discovery only as to those items of evidence specifically argued by Bryant in his brief on return to remand.
In Ex parte Land, 775 So.2d 847 (Ala.2000), overruled on other grounds by State v. Martin, 69 So.3d 94 (Ala.2011), the Alabama Supreme Court stated:
“We agree with the Court of Criminal Appeals that ‘good cause’ is the appropriate standardly which to judge post-conviction discovery motions. In fact, other courts have adopted a similar .‘good-cause’ or ‘good-reason’ standard for the postconvietion discovery process. See [State v.] Marshall, [148 N.J. 89, 690 A.2d 1 (1997) ]; State v. Lewis, 656 So.2d 1248 (Fla.1994); People ex rel. Daley v. Fitzgerald, 123 Ill.2d 175, 121 Ill.Dec. 937, 526 N.E.2d 131 (1988). As noted by the Illinois Supreme Court, the good-cause standard guards against po *1139 tential abuse of the postconvietion discovery process. See Fitzgerald, supra, 123 Ill.2d at 183, 121 Ill.Dec. 937, 526 N.E.2d at 135. We also agree that New Jersey’s Marshall case provides a good working framework for reviewing discovery motions and orders in capital cases. In addition, we are bound by our own rule that ‘an evidentiary -hearing must be held on a [petition for postcon-viction relief] which is meritorious on its face, ie., one which contains matters and allegations (such as ineffective assistance of counsel) which, if true, entitle the petitioner to relief.’ Ex parte Boatwright, 471 So.2d 1257, 1258 (Ala.1985).
“We emphasize that this holding— that postconviction discovery motions are to be judged by a good-cause standard — does not automatically allow discovery under Rule 32, Ala. R.Crim. P., and that it does not expand the discovery procedures within Rule 32.4. Accord Lewis, supra, 656 So.2d at 1250, wherein the Florida Supreme Court stated that the good-cause standard did not affect Florida’s rules relating to postconviction procedure, which are similar to ours. By adopting this standard, we are only recognizing that a trial court, upon a petitioner’s showing of good cause, may exercise its inherent authority to order discovery in a proceeding for postconviction relief. In addition, we caution that postconviction discovery does not provide a petitioner with a right to ‘fish’ through official files and that it ‘is not a device for investigating possible claims, but a means of vindicating actual claims.’ People v. Gonzalez, 51 Cal.3d 1179, 1260, 800 P.2d 1159, 1206, 275 Cal.Rptr. 729, 776 (1990), cert. denied, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 85 (1991). Instead, in order to obtain discovery, a petitioner must allege facts that, if proved, would entitle him to relief. Cf. Porter v. Wainwright, 805 F.2d 930, 933 (11th Cir.1986) (‘a hearing [on a habeas corpus petition] is not required unless the petitioner alleges facts which, if proved, would entitle him to federal habeas relief), cert. denied, 482 U,S. 918, 919, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987). Furthermore, a petitioner seeking postconviction discovery also must meet the requirements of Rule 32.6(b), Ala. R.Crim. P., which states:
“ ‘The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and' mere conclusions of law shall not be sufficient to warrant any further proceedings.-’ •
“That having been said, we must determine whether Land presented the trial court with good cause for ordering the requested discovery.' To do that, we must examine Land’s basis for the' relief requested in his postconviction petition and determine whether his claims are facially meritorious. ■ Only after making that examination and determination can we determine whether Land has shown good cause.”
775 So.2d at 852 (footnote omitted).
Bryant argues on return to remand that he established good cause for discovery of “videotape, photos, and drawings or diagrams that police made of the crime scene” (Bryant’s' RTR brief, p. 19); of “original photos of the' crime' scene, the evidence, and -the victim” (Bryant’s RTR brief, p. 21); of “high-quality photos of the crime scene” (Bryant’s RTR brief, p. 18); of “the original negatives” of all photographs of the crime scene (Bryant’s RTR brief, p. 26); and of all “clothing worn by the potential participants in the crime” (Bryant’s RTR brief, p. 27). He argues *1140 that these items of evidence were necessary to prove his claim that his trial counsel at his first trial were ineffective for not retaining a blood-spatter expert and that he adequately established that these items were necessary through an affidavit he attached to his supplemental motion for discovery from his postconviction blood-spatter expert, Tom Bevel, in which Bevel averred that these items were necessary for him to conduct a blood-spatter analysis.
Bryant further argues that he established good cause for discovery of “the mixed DNA sample found on Bryant’s jeans” and of “the used condoms found at the crime scene.” (Bryant’s RTR brief, p. 18.) He argues that these items were necessary to prove his claim that his trial counsel at his first trial were ineffective for not retaining a DNA expert. . Finally, Bryant argues that he established good cause for discovery of the entire “DFS [Department of Forensic Sciences] file for the case” (Bryant’s RTR brief, p. 18), including “all of the testing notes in the case file, the chain of custody documents, .• any bench notes, any descriptions of the evidence, any descriptions of the . stains, any DNA results present (including the DNA profiles that were obtained), and the standard operating procedures for the lab.” (Bryant’s RTR brief, p. 28.) Bryant argues that the file of the Alabama Department of Forensic Sciences .(“DFS”) was necessary for his, postconviction,DNA expert, Matthew Qugrtaro, “to review the DFS’s work.” (Bryant’s RTR ¡brief, pp. 20-21.) He also argues that he adequately established the necessity of this evidence by attaching to his supplemental discovery motion a “Case Review Submission Form” from Orchid Cellmark, the forensic-testing company where Quartaro was employed, which listed the above items as necessary for a “case review.” (RTR, C. 752-53.)
Assuming, without deciding, that the circuit court’s denial of the above-listed items of discovery constituted error, we find that any error was harmless. The harmless-error rule has been applied in Rule 32 proceedings in various contexts. See, e.g., Jenkins v. State, 105 So.3d 1234, 1242 (Ala.Crim.App.2011), aff'd, 105 So.3d 1250 (Ala.2012); Ingram v. State, 51 So.3d 1094, 1106 (Ala.Crim.App.2006), rev’d on other grounds, 51 So.3d 1119 (Ala.2010); Beckworth v. State, [Ms. CR-07-0051, May 1, 2009] — So.3d --, -(Ala.Crim.App.2009), rev’d on other grounds, [Ms. 1091780, July 3, 2013] — So.3d -(Ala.2013); Hyde v. State, 950 So.2d 344, 371 (Ala.Crim.App.2006); Wilson v. State, 911 So.2d 40, 46 (Ala.Crim.App.2005); and Young v. State, 600 So.2d 1073] 1075-76 (Ala.Crim.App.1992) (all applying harmless-error analysis in Rule 32 proceedings). Rule 45, Ala. R.App. P., provides, in part:
“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
“The purpose.of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.” Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998).
As explained in Part III.A. of this opinion, we conclude that Bryant failed to prove that his trial counsel’s not retaining *1141 a blood-spatter expert and a DNA expert constituted deficient performance under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The results of any blood-spatter or DNA analyses, although relevant to Bryant’s claims that his trial counsel at his first trial were ineffective for not retaining a blood-spatter expert and a DNA expert, were relevant only to whether Bryant was prejudiced by counsel’s performance, i.e., the prejudice prong of Strickland, not to whether counsel’s performance was deficient, i.e., the performance prong of Strickland. Indeed, in requesting discovery of these items in his supplemental discovery motion,'Bryant himself admitted as much, arguing that he was entitled to the items listed above because, “in order to shoiv prejudice with respect to his blood-spatter claim, Mr. Bryant must show what testimony a blood-spatter expert would have offered if Mr. Bryant’s counsel had retained such an expert at trial” (RTR, C. 731; emphasis added), and because, “[i]n order to show prejudice with respect to his DNA claim, Mr. Bryant’ must show what testimony a DNA expert would have offered if Mr. Bryant’s counsel had retained such an expert at trial.” (RTR, C. 733; emphasis added.) Additionally, in the spreadsheet he attached to his supplemental discovery motion, Bryant asserted as to each of the 53 categories of evidence of which he requested discovery that the evidence Was relevant and necessary because he was required “[t]o show prejudice” or “[t]o establish that [he] was prejudiced” by his trial counsel’s alleged errors. (RTR, C. 740-46.)
Because the requested items listed above would have been relevant and necessary only to establish prejudice, as opposed to deficient performance, and because, for the reasons stated in Part III.A. of this opinion, we agree with the circuit court that counsel’s performance was not deficient, any error in denying discovery of the above-listed items was harmless. See, e.g., Evans v. State, 788 N.W.2d.38, 49-50 (Minn.2010) (applying harmless-error rule to denial of postconviction discovery).
III.
Bryant also contends on return to remand that the circuit court erred in denying the claims of ineffective assistance of counsel for which this Court remanded this case for further proceedings.
Derek Yarbrough, Deborah Seagle, and Gene Spencer represented Bryant at'his first trial. Michael Crespi and John' Byrd, Jr., represented Bryant at his second penalty-phase trial. At the evidentiary hearing on remand, Bryant called Yarbrough, Seagle, Spencer, and Crespi to testify. Bryant did not call Byrd to testify. ■ Additionally, Bryant called to testify at the hearing Thomas Bevel, a crime-scene-investigation and bloodstain and blood-pattern expert; Angelo Della Manna, a forensic scientist with DFS who reviewed the DNA testing conducted with respect to this case; Matthew Quartaro, a forensic scientist with Orchid Cellmark in Dallas, Texas; Sheliah Gail Bryant (hereinafter “Sheliah”), Bryant’s sister; and Ricky Vickers, a State’s witness at Bryant’s trials.
At the hearing, Yarbrough testified that he was first licensed to practice law in 1996 and that, in 1997, not long after he had passed the bar exam, he was appointed to represent Bryant.- Yarbrough said that he had been practicing law for only a few months when he was appointed but that he had been doing “[m]ostly criminal” work in the few months he had been practicing. (RTR, R. 97.) Yarbrough also testified that, during law school, he had worked in his stepfather’s law firm and had assisted in preparing cases during that *1142 time. Yarbrough testified that he had never tried a capital case or even a murder case at the time he was appointed to represent Bryant but that he had tried other cases. Subsequently, Seagle was also appointed to represent Bryant. Because Seagle had five years of experience, she was considered lead counsel, but, as a practical matter, Yarbrough was “in control of the case” and tried most of the case. (RTR, R. 100.) At a later date, Yarbrough said, he requested that a third attorney be appointed to assist in the case because neither he nor Seagle “had ever been involved in a mitigation case,” and Spencer was thep appointed. (RTR, R. 100-01.) Spencer’s primary role was to prepare for and try the penalty phase of the trial.
Spencer confirmed Yarbrough’s testimony, stating that he was the last of three attorneys appointed to represent Bryant and that he had “handled the penalty phase” of the first trial. (RTR, R. 18.) According to Spencer, Yarbrough was lead counsel for the guilt phase of the trial, but Spencer provided advice to Yarbrough regarding the guilt phase.
Seagle testified that she had been practicing law since 1988 when she was appointed to represent Bryant. Before her appointment to Bryant’s case, she had never represented a defendant in a capital case, but she had tried a murder case, as well as a rape case that involved DNA evidence. Seagle testified that she and Yarbrough “worked together” on the guilt phase of the trial while Spencer was responsible for the penalty phase of the trial. (RTR, R. 56.) Although they worked together in preparation for the trial, Seagle testified, at trial she “focused more on the DNA evidence, and [Yarbrough] handled a lot of the other witnesses.” (RTR, R. 56.)
Crespi testified at the hearing that in 1998 he was practicing law in Dothan and had been licensed to practice for 25 years at that time. He was appointed to represent Bryant on appeal from Bryant’s capital-murder conviction and sentence of death. The appeal was successful “in part” in that he obtained a reversal of the death sentence and a new penalty-phase trial. (RTR, R. 22.) Crespi said that he represented Bryant in the second penalty-phase trial in 2004, along with John Byrd, Jr. According to Crespi, at that time, he had tried “four or five” capital trials and “100 percent” of his law practice was devoted to criminal work. (RTR, R. 43.) Crespi testified that he was lead counsel for the second penalty-phase trial and made the decisions regarding strategy.
To satisfy his burden of proof under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Bryant had the burden of proving (1) that his counsel’s performance was deficient and (2) that the deficient performance actually prejudiced his defense. To prove deficient performance, Bryant had the burden to prove that his counsel’s performance “fell below ah objective standard of reasonableness ... considering all the circumstances” at the time. Ex parte Lawley, 512 So.2d 1370, 1372 (Ala.1987). In order to eliminate the distorting effects of hindsight, there is “a strong presumption that counsel’s conduct [fell] within the wide range of reasonable professional assistance,” Strickland, 466 U.S. at 689, and Bryant had the burden to prove “that his attorney’s representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.” Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). In other words, Bryant had the burden to prove that no reasonable attorney would have chosen the *1143 course of action that his attorneys chose. See, e.g., Harvey v. Warden Union Corr. Inst., 629 F.3d 1228, 1239 (11th Cir.2011) (“To put it another way, trial counsel’s error must be so egregious that no reasonably competent attorney would have acted similarly.”). Moreover, “[c]ourts are ‘required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons ... counsel may have had for proceeding as they did.’ ” Stallworth v. State, 171 So.3d 53, 92 (Ala.Crim.App.2013) (opinion on return to remand) (quoting Cullen v. Pinholster, 563 U.S. 170, 196, 131 S.Ct. 1388, 1407, 179 L.Ed.2d 557 (2011)).
To prove prejudice, Bryant had the burden to prove “that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694. “A reasonable probability is a probability sufficient to undermine confidence in the outcome,” id., and “[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.” Id. at 693. With respect to errors that allegedly occurred at the penalty phase of the trial, Bryant had the burden to prove that “there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs- the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Id. at 695. “ ‘It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied.’ ” James v. State, 61 So.3d 357, 364 (Ala.Crim.App.2010) (quoting Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir.1999)).
Moreover, in reviewing claims of ineffective assistance of counsel, this Court need not consider both prongs of the Strickland test. See Thomas v. State, 511 So.2d 248, 255 (Ala.Crim.App.1987) (“In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one' of the prongs.”). Because both prongs of the Strickland test must be satisfied to establish ineffective assistance of counsel, the failure to establish one of the prongs is a valid basis, in and of itself, to deny the claim. As the United States Supreme Court has explained:
“Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel’s performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel’s performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.”
Strickland, 466 U.S. at 697.
With these principles in mind, we address in turn each of the ineffective-assistance-of-counsel claims Bryant raised in his first amended petition.
A.
Bryant alleged in his first amended petition .that his trial counsel at his first- trial *1144 •were ineffective for not properly investigating-and retaining a blood-spatter expert and a DNA expert. In its order on remand, the circuit court found .that. trial counsel had made reasonable strategic, decisions not to hire a blood-spatter or D.NA expert and that Bryant had not been prejudiced. The court stated:
, “At his trial, [Bryant] was represented by Derek Yarbrough and Deborah Seagle (hereinafter collectively referred to as ‘Trial Counsel’ and individually referred to as ‘Mr. Yarbrough’ and .‘Ms. Seagle’). Mr. Yarbrough acted as.lead counsel. As his first ground of ineffective assistance of counsel, [Bryant] alleges that trial counsel at his first trial was ineffective for not properly investigating and retaining a blood-spatter expert and a DNA expert. [Bryant] argues that had trial counsel investigated and retained such experts, trial counsel would have' been able- to explore a different defense strategy to explain the mixed sample of blood' found on [Bryant’s] jeans, specifically that [Bryant] and the deceased, Mr. Hollis, engaged in consensual sex as the explanation for the blood on his jeans.
[[Image here]]
“After considering the evidence presented at the Rule 32 hearing along with the briefs filed by [Bryant] and the State of Alabama, the Court makes the following findings: Trial Counsel and [Bryant] developed a trial strategy for the guilt phase based in large part on [Bryant’s] statement to law enforcement that he was not present when Mr. Hollis was shot but that he assisted in moving Mr. Hollis’ body for drugs. Further, the Court finds that Trial Counsel, in consult with [Bryant], based this strategy on [Bryant’s] inconsistent versions of the events that happened, along with investigations conducted, including, but not limited to, interviewing people in the community- that knew [Bryant]. Trial Counsel considered testing the condoms but believed that the risk of doing so was too great because, if the results indicated that [Bryant] had used those condoms,, the defense strategy they had developed would be sunk. Trial Counsel knew that if the condoms were tested and [Bryant’s] DNA were identified, they could not argue that he was not present at the time Mr. Hollis was killed but only helped move the body after Mr. Hollis was killed. Also, Trial Counsel did not believe that a negative result on the condoms would have added to the defense' strategy because the condoms were out in the parking lot with other trash which would have been a basis for rebuttal by the.State. Trial Counsel’s investigation led them to. information that [Bryant] was possibly bisexual which increased them concern for testing the condoms and the potential damage to their defense strategy if the condoms were linked to [Bryant]. Notwithstanding concerns over DNA testing of the condoms, Trial Counsel did seek extraordinary funds for DNA testing and did in fact contact Cellmark Diagnostic testing regarding testing the condoms.. However, ultimately Trial Counsel made the strategic decision to forgo DNA testing of the condoms due to the risk a positive DNA result would have had on the most plausible defense strategy they had to work with .., that [Bryant] helped move Mr. Hollis’ body after he was killed in exchange for drugs.
“In addition to considering testing the condoms, Trial Counsel considered the blood stain found on [Bryant’s] pants. Trial Counsel felt that the blood stain on [Bryant’s] pants was consistent with [Bryant’s] statement to law enforcement that he was not present when Mr. Hollis was killed but-that-he simply-helped *1145 move his body. Additionally, Mr. Yar-brough indicated that the State did not contend that • the blood stain on [Bryant’s]-pants resulted from a gunshot wound. Lastly, at the time of the trial, DNA testing was relatively new and none of the criminal defense attorneys in Houston County, including those more senior attorneys with whom Mr. Yar-brough practiced, had retained' a blood splatter expert before. Mr. Yarbrough consulted with his step-father, a licensed, practicing attorney, in Houston County about the case and had previously held a third year practice card and had worked on cases with his step-father and represented clients under his third year practice card. Therefore, he had experience in analyzing, cases and developing trial strategies. Further, [Bryant] was also represented by Ms. Seagle who was an experienced criminal defense attorney. Although Mr. Yar-brough acknowledged that the defense could have tried to show that [Bryant] lied to law enforcement, he felt that such strategy would not have been effective in this case and could have been detrimental. Further, although Mr. Yar-.brough acknowledged that if DNA testing of the condoms proved that the DNA contained therein belonged to someone other than [Bryant] such results could have been ■ beneficial to [Bryant’s] defense. Trial Counsel ultimately chose to defend the charge based on [Bryant’s] statement to law enforcement that he helped move Mr. Hollis’ body in' ex-' change for drugs as a result of a thorough investigation and analysis of the facts.
“Based on the foregoing analysis of trial counsel’s actions, the Court finds that Trial Counsel made strategic, decisions regarding DNA testing, of the con.doms and the blood stain on [Bryant’s] pants based on their reasonable investigation, [Bryant’s] actions and statement to law enforcement, consultations with, . [Bryant] and a reasonable analysis of the potential effects of DNA testing upon the defense strategy formulated. It is easy to argue that the outcome would háve been different if DNA testing had been conducted and a blood splatter expert had been engaged; however, there is no way to reasonably show that the jury’s verdict at the guilt phase would have-been different or the death sentence would have been avoided had trial counsel pursued the alterative theory based on consensual sex. ‘[T]he mere existénce of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel’s failure to present that theory. Hindsight. does not elevate unsuccessful trial tactics into ineffective assistance of , counsel.’ Davis v. State, 44 So.3d [1118, 11]32 [ (Ala.Crim.App.2009) ]. Accordingly, the Court finds that Trial Counsel were not ineffective for not properly investigating and retaining a blood-spatter expert and .a DNA expert.”
(RTR, C. 1332-34.)[6] For the reasons explained below, we agree with the circuit court’s finding that trial counsel’s performance was pot deficient for not investigating and-retaining a blood-spatter expert-and a DNA expert.[7]
*1146 Initially, we point out that, at the evi-dentiary hearing, Yarbrough testified that the defense theory at trial was based on Bryant’s statement to police. Specifically, Yarbrough testified:
“The overall — it’s kind of a difficult question, because we were kind of having problems in the beginning from [Bryant] about getting actually what had happened, what had occurred. And we would get kind of different stories about what exactly had happened. Ultimately, we decided to go with the theory that he had actually told the police, because we thought we could sell that theory.
[[Image here]]
“[A]s part of the investigation, we had sent [the investigator] out to talk with people in the community, talk about [Bryant] and things of that nature. And based on what we were told about [Bryant] and maybe — let me back up. We were kind of told that [Bryant] might have been bisexual by some witnesses. Whether or not that was true or not, I have no idea. We were told— [the investigator] had come to me and said that one witness had said that he would dress up as a woman at times, things of that nature. So as part of that, you know, I was concerned about the actual — maybe whether or not there was sex involved in this particular case. We had a lot of discussions about that, you know, how were we going to proceed with that. And ultimately, we decided that going on his statement was really the only way that we could proceed, because I don’t think we could prove anything else.”
(RTR, R. 175-76.)
In his statement to police, Bryant admitted to riding around with Hollis and Hollis’s cousin, Bert Brantley, on the night of the murder. He also admitted that, at some point during the evening, he asked Brantley to leave and that he and Hollis then continued riding around- until they met up with a man named Terry Johnson. Bryant said that, after he obtained crack cocaine from Johnson, Hollis got in a vehicle with Johnson and allowed Bryant to keep possession of Hollis’s vehicle. A short time later, Bryant said, he saw Johnson at Mickey’s Lounge in Dothan, at which point Johnson asked him to move Hollis’s body. Bryant admitted that he agreed to move Hollis’s body in exchange for drugs and that he obtained the assistance of his cousin, Ricky Vickers, to move the body. Bryant stated that he and Vick-ers took Hollis’s body to Florida and dumped it in the woods, drove around the panhandle of Florida for a while, and then returned to Dothan and abandoned Hollis’s vehicle. At the end of his statement, when asked why it took three shots to kill Hollis, Bryant responded, “Man I don’t know, I think I need help ... Sometimes I am just not Jerry,” and then put his head down on the table and refused to speak further. (Record on Direct Appeal (“RDA”), R. 788.)
To support the defense theory and Bryant’s statement to police, trial counsel presented testimony at trial that Raymond Mathis — who testified against Bryant and who was admittedly with Bryant and Vick-ers when they dumped Hollis’s body in Florida — was also known as Terry Johnson — the man who Bryant had implicated in Hollis’s murder. Bryant’s counsel also presented testimony that Mathis was bisexual and that he had been seen in Do-than at Mickey’s Lounge speaking with Bryant the night of the murder. Further, counsel elicited on cross-examination of Mathis that Mathis had thrown away the clothing and shoes he had been wearing *1147 the night of the murder and then argued to the jury that the only rational basis for Mathis to get rid of all of his clothing from the night of tihe murder was because his clothing and shoes had been covered in blood, unlike Bryant’s clothing.

Blood-Spatter Expert

In his first amended petition, Bryant asserted that “[t]rial testimony revealed that blood spatter was found on a building, on trees, and on the ground in the area where the murder occurred,” and that “the medical examiner [had] testified that Donald Hollis was shot three times at close range,” but that “only a minuscule amount of blood (a drop the size of an eraser on a pencil) was found on Bryant’s clothing.” (C. 465.) Bryant alleged that counsel should have retained a blood-spatter expert “to independently analyze the crime scene and Bryant’s clothing to determine whether the blood spatter found on Bryant was consistent with’ the types of wounds Donald Hollis sustained” because, according to Bryant, had counsel done so, a blood-spatter expert “would have conducted tests to recreate the crime” and “may have testified that a person who shoots another at close proximity should have a significant amount of blood on his person” or that “where the gun shot wounds create blood spatter in the pattern as on and proximity to the building at the location where Hollis was shot, the shooter would have a significant amount of blood on his clothing or, at a minimum, more than a minuscule drop of blood that cannot even be attributed solely to the victim.” (C. 465-66.) Bryant asserted that, at the time of his trial, “numerous blood spatter experts were available to testify, including Captain Tom Bevel, owner of TBI LLC located in Oklahoma, and Gary Rini, forensic science consultant located in Cleveland, Ohio.” (C. 466.)
Yarbrough testified at the evidentiary hearing that he had access to the evidence and to the photos of- the murder scene before trial and that he knew that only a small amount of blood had been found on Bryant’s jeans even though Hollis had been shot three times. at point-blank range. Yarbrough said .that he did not remember whether, when , he was preparing for trial, he had thought about the fact that point-blank shots would probably have generated a lot of blood. Yarbrough said that he did not hire a blood-spatter expert and that he did not remember whether or not he spoke to someone, at Cellmark Laboratories about blood spatter. Yarbrough further testified that he could not remember whether he made a strategic- decision not to hire a blood-spatter expert. .Yar-brough said, however, that the State, never argued to the jury. that, the blood on Bryant’s jeans came from. the. gunshots but, rather, argued simply that the blood contained a mixture of Bryant’s DNA and Hollis’s DNA.
Yarbrough conceded that with “hindsight being 20/20, would I have done something different,' yes,- possibly.” (RTR, R. 141.) However, when asked whether a blood-spatter expert, and whether the blood found on Bryant’s jeans were big components of the defense, Yarbrough answered in the negative because, according to Yarbrough, “it would be reasonable that there would be blood on Jerry Bryant based on our defense.” (RTR, R. 184.) Specifically, according to Yarbrough, the biood found on Bryant’s jeans was consistent with and supported the defense theory. Yarbrough also said" that it was not common in 1998 in Houston County to retain blood-spatter experts, and that there were several more experienced attorneys in his law firm that he could discuss cases with, but that none of them had mentioned to him the idea of getting a blood-spatter expert. Seagle also testified *1148 that she was not familiar with blood-spatter experts at the time of Bryant’s trial and that she had never in her practice at that time seen a. blood-spatter expert called to testify on a defendant’s behalf.
At the hearing, Bryant presented the testimony of Thomas Bevel, the president of Bevel, Gardner and Associates, a forensic education and consulting group.- Based on his credentials, Bevel was deemed an expert by the circuit court in crime-scene investigation and bloodstain and blood-pattern analysis. Bevel said that he was providing consulting services in 1997 and 1998 and that, at that time, lawyers would learn of his services primarily by “word of mouth” but that he also had a “rudimentary website.” (RTR, R. 212.) Bevel stated that he would have been available to consult in 1998. Bevel said that, in this case, he reviewed the district attorney’s file on Hollis’s murder, which included investigative reports, the autopsy protocol, and “a number of printed-’out photographs that were black and white originally” but that he also later examined “in color.” (RTR, R. 217.) From the documents he reviewed, Bevel determined that Hollis had been shot three times in the head with a .25 caliber pistol at close range. Such close-range gunshots, Bevel said, ‘‘can” create blood spatter. (RTR, R. 217.) However, Bevel said that he was unable to determine what type of blood spatter was created in this particular case based on the information he had.[8]
Bryant failed to prove that his. trial counsel’s not retaining a blood-spatter expert constituted deficient performance. Yarbrough testified that he could not remember whether the decision not to hire a blood-spatter expert was strategic. Thus, the record is silent on this critical issue. “ ‘If the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness, is sufficient to deny relief on [an] ineffective assistance of counsel claim.’ ” Davis v. State, 9 So.3d 539, 546 (Ala.Crim.App.2008) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)). Indeed:
“ ‘Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the Strickland [v. Washington, 466 U.S. 668 (1984),] presumption of effective performance. Without evidence establishing that counsel’s strategy arose from the vagaries of “ignorance, inattention or ineptitude,” Cox [v. Donnelly, 387 F.3d 193 (2nd Cir.2004) ], Strickland’s strong presumption must stand.’ ”
Johnson v. State, [Ms. CR-05-1805, June 14, 2013] — So.3d -, - (Ala.Crim.App.2007) (opinion on return to remand) (quoting Greiner v. Wells, 417 F.3d 305, 326 (2d Cir.2005)).
Moreover, after thoroughly reviewing the record from Bryant’s direct appeal and bearing in mind the strong presumption that counsel’s conduct was reasonable, we conclude, as the circuit court did, that trial counsel was not deficient for not retaining a blood-spatter expert. There are a range of logical reasons that may have informed Yarbrough’s decision not to hire a blood-spatter expert. The drop of blood on Bryant’s jeans was consistent with the defense theory that Bryant had moved Hollis’s body but had not participated in the murder, which was supported not only by Bryant’s statement to police but also by other evidence presented at trial. Additionally, common *1149 sense indicates that .when a person is shot three times at point-blank range, there will in all likelihood be a large amount of blood spatter on the shooter. Yarbrough could have reasonably concluded, even without having actually consulted with a blood-spatter expert, that he could- create,,.the necessary reasonable doubt as to Bryant’s involvement in the murder simply by having the jury hear Bryant’s statement to the police, and the other evidence supporting Bryant’s statement to police, and having the jurors use their own common sense. Although a blood-spatter expert may have strengthened the defense theory at trial, “ ‘[cjounsel’s failure to call an expert witness is not per se ineffective assistance, even where doing so may have made the defendant’s case stronger, because the State could always call its own witness to offer a contrasting opinion.’ ” Benjamin v. State, 156 So.3d 424, 443 (Ala.Crim.App.2013) (quoting People v. Hamilton, 361 Ill.App.3d 836, 847, 838 N.E.2d 160, 170, 297 Ill.Dec. 673, 683 (2005)). Simply put, we cannot say that no reasonable attorney would have chosen not to hire a blood-spatter expert under the circumstances in this case.
Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.

DNA Expert to Test DNA Sample on Bryant’s Jeans

Bryant alleged in his first amended .petition that although the State presented expert testimony that a “tiny blood spot found on Bryant’s pants was a mixture of Bryant’s and the victim’s blood[, that] expert[ ] ... testified that he could not be absolutely sure,” and Bryant argued , that counsel should have retained a DNA expert “to contradict or provide the jury an alternative. explanation regarding the blood and to whom it belonged.” (C. 467.) Bryant further argued, that a DNA expert “would have evaluated the viability of obtaining a positive DNA match on such a small amount of blood,” which, “[h]ad the DNA expert indicated that it was impossible to obtain a reliable DNA result on this sample, ... would have removed the one piece of physical evidence tying Bryant to Hollis’ homicide.”[9] (C. 467.)
At the evidentiary hearing, Seagle testified that the defense team received a list of all the physical evidence that the police had collected in reference to Bryant’s case and that they requested and received records from the Dothan Police Department. Seagle testified that there was a “mixed blood sample” on Bryant’s blue jeans that testing indicated “was consistent with being the victim’s and Mr. Bryant’s” DNA but that the State’s expert could not conclusively say that it was, in fact, the victim’s and Bryant’s DNA. (RTR, R. 65.) Seagle said that, other than the DNA on Bryant’s blue jeans, there was no other physical evidence tying Bryant to the murder scene but that there was other evidence linking Bryant to the murder.
Because there was no physical evidence tying Bryant to the murder scene other than the DNA evidence on his jeans, Sea-gle said, the defense did challenge the admissibility of that DNA evidence, and a pretrial hearing on the admissibility of the DNA evidence was conducted. Additionally, at trial, Seagle cross-examined the State’s DNA expert, Angelo Della Manna, in an attempt to “poke holes” in the State’s case. (RTR, R. 80.) In cross-examining Della Manna, Seagle tried to show that because they were Bryant’s blue jeans *1150 there could be no way of knowing when his DNA got on them and that merely because the DNA was consistent with someone does not mean that it conclusively was that person.
Seagle further testified that Yarbrough prepared “the bulk” of the pretrial motions and that she did not recall whether they received funds for a DNA expert. (RTR, R. 70.) Seagle said that they did not hire a DNA expert to independently analyze DFS’s test results of the blood on Bryant’s jeans or to review DFS’s testing procedures but that she could not recall why they did not. Seagle testified that she did recall discussing the possibility of a DNA expert with Yarbrough but that she just could not remember why they chose not to pursue it.
Yarbrough testified that the State’s DNA expert testified at trial that both Bryant’s DNA and Hollis’s DNA were found on a mixture on Bryant’s jeans. Yarbrough said that he filed a motion asking for funds for a DNA expert, specifically for Cellmark Laboratories, but that, “on the DNA issue, that was something that Deborah Seagle — that I felt that Deborah Seagle was to handle.” (RTR, R. 109.) Yarbrough said, however, that he was “sure” there were discussions between himself and Seagle about the DNA evidence but that he did “not remember” what those discussions involved. (RTR, R. 109.) Yarbrough also could not independently recall any of the meetings or telephone calls involving DNA. Yarbrough did recall going to Birmingham to look at the physical evidence, but he did not recall contacting Cellmark Diagnostics, Inc., a forensic laboratory located in German-town, Maryland, although his file reflected that he did. Yarbrough testified that he was familiar with DNA and that he knew that DNA testing was available because, as a law student, he had worked at his stepfather’s law firm and “had been involved in cases with my stepfather as a law student that involved DNA.” (RTR, R. 114.) In some of those cases, his stepfather had retained and called to testify DNA experts. Yarbrough testified that he did “not remember a strategic reason as to why [they] did or did not call a DNA expert.” (RTR, R. 116.) Yarbrough said, however, that “if, for whatever reason, I would have thought there should have been a DNA expert, I’m sure that I would have done what I thought to be — to get one.” (RTR, R. 117.) Yarbrough admitted that during opening statements at trial he conceded that the State’s DNA testimony regarding the blood on Bryant’s jeans was correct “due to [Bryant] moving the body.” (RTR, R. 126.) When questioned whether his decision to concede the DNA was strategy based on discussions with DNA experts or co-counsel, Yarbrough said:
“I don’t know that I can answer that, because, undoubtedly, I talked to somebody about this [possible DNA testing]. There’s notes that I talked with somebody. So I mean, I could have talked to them about it and made the decision, or I couldn’t. I don’t know — I don’t know the answer to it.”
(RTR, R. 130.)
Matthew Quartaro testified at the hearing that he had been the supervisor of forensics at Orchid Cellmark in Dallas, Texas, since 2005 and that he had been a DNA analyst for Orchid Cellmark since 2002. Quartaro explained in detail the items of evidence Orchid Cellmark would have needed in 1997 or 1998 to have completed a DNA case review but stated that he was not provided any of the evidence he needed.
Bryant failed to prove that his trial counsel’s not retaining a DNA expert to test the blood found on Bryant’s jeans constituted deficient performance. Nei *1151 ther Yarbrough nor Seagle could recall whether the decision not to hire a DNA expert to test the blood on Bryant’s jeans was strategic. Thus, the record is once again silent on this critical issue. As already noted, “ ‘[i]f the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.’” Davis v. State, 9 So.3d 539, 546 (Ala.Crim.App.2008) (quoting Howard v. State, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)).
Moreover, after thoroughly reviewing the record from Bryant’s direct appeal and bearing in mind the strong presumption that counsel’s conduct was reasonable, we conclude, as the circuit court did, that trial counsel was not deficient for not retaining a DNA expert to test the blood on Bryant’s jeans. Yar-brough testified at the evidentiary hearing that, based on Bryant’s inconsistent stories to counsel regarding what had happened and based on information his investigator had found, he chose to pursue a theory of defense consistent with Bryant’s statement to police, i.e., that Bryant had moved Hollis’s body but had not been involved in Hollis’s murder.
“The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated- altogether. And -when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel’s conversations with the defendant may be critical to a proper assessment of counsel’s investigation decisions, just as it may be critical to a proper assessment of counsel’s other litigation decisions. See United States v. Decoster, [199 U.S.App.D.C. 359,] 372-373, 624 F.2d [196,] 209-210 [ (D.C.Cir.1976) ].”
Strickland, 466 U.S. at 691. Based on the record, we cannot say that counsel’s choice to pursue a theory consistent with Bryant’s statement to police was unreasonable, especially in light of the fact that counsel was able to present evidence to support that statement. Under the theory presented, a DNA expert to test the mixture found on Bryant’s jeans was unnecessary because the fact that Hollis’s DNA was found on Bryant’s jeans was consistent with the defense theory that Bryant had moved Hollis’s body after the murder, and counsel in fact used the DNA evidence to support their theory of defense.
Additionally, we point out that “ ‘ “the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.” ’ ” Davis v. State, 44 So.3d 1118, 1136 (Ala.Crim.App.2009) (quoting State v. Hartman, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150, 1177 (2001), quoting in turn State v. Nicholas, 66 Ohio St.3d 431, 436, 613 N.E.2d 225, 230 (1993)).
“ ‘ “[H]ow to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to *1152 forego [sic] cross-examination and/or to forego [sic] development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.” ’ ”
Stallworth v. State, 171 So.3d 53, 86 (Ala.Crim.App.2013) (quoting Brown v. State, 292 Ga. 454, 456, 738 S.E.2d 591, 594 (2013), quoting, in turn Phillips v. State, 285 Ga. 213, 222-23, 675 S.E.2d 1 (2009)). “‘A defendant’s lawyer does not have a duty .in every case to consult experts even if the government is proposing to put on expert witnesses.... There may be no reason to question the validity of the government’s proposed evidence or the evidence may be so weak that it can be demolished on cross-examination.’ ” Stallworth, 171 So.3d at 87 (quoting Miller v. Anderson, 255 F.3d 455, 459 (7th Cir.2001) (citations omitted)). Indeed, “it can-often be more effective to elicit beneficial testimony from the State’s expert than to present the same evidence through an expert retained and paid by the defense.” Dowthitt v. Johnson, 180 F.Supp.2d 832, 857 (S.D.Tex.2000).
Here, the trial record indicates that Sea-gle thoroughly cross-examined Angelo Della .Manna, the State’s DNA expert at trial, regarding the DNA found on Bryant’s jeans and elicited testimony beneficial to the defense. At trial, Della Manna testified that the sample on Bryant’s jeans was “consistent” with a mixture of Bryant’s DNA and Hollis’s DNA. Through cross-examination, Seagle elicited testimony that Della Manna could not conclusively state that the mixture on Bryant’s jeans did, in fact, contain the DNA of both Hollis and Bryant and that Della Manna could not even provide a statistical probability of the mixture’s containing both Hollis’s and Bryant’s DNA. Additionally, Seagle elicited testimony from Della Manna on cross-examination that a blood stain on a pair of sweatpants found in the apartment where Bryant was arrested contained DNA that did not match either Bryant’s DNA or Hollis’s DNA, but which was so similar to Bryant’s DNA that it was possibly the DNA of one of Bryant’s relatives. We cannot say it was unreasonable for counsel to choose to rely on cross-examination instead of retaining their own expert,
Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.

DNA Expert to Test Condoms Found at the Murder Scene

Bryant also alleged in his first amended petition that his trial counsel should have had tested for DNA two used condoms found at the scene where Hollis was killed. Specifically, Bryant alleged that although counsel “believed that the crime was sexually motivated, [they did not] conduct[ ] an adequate investigation into any possible connections regarding the sexual undertone of this crime” because they “failed to get the condoms tested, or file appropriate motions regarding this evidence.” (C. 467.) Bryant asserted that counsels’ failure “to present an expert on DNA evidence is below the objective standard of reasonableness and seriously' prejudiced Bryant becausé the expert may have presented exculpatory evidence.” (C. 467.) According to Bryant, Yarbrough’s case file indicated that he had contacted Cellmark Diagnostics, Inc., and that Cellmark Diagnostics “was available and willing to do DNA testing on the evidence in this case” and that, “[b]ut for counsel’s failure to call a DNA expert, there is a reasonable likelihood that Bryant would have been acquitted or would have avoided a death sentence.” (C. 467-68.)
At the evidentiary hearing, Seagle said that the State did not have the condoms *1153 tested for DNA and that the defense likewise did not have the condoms tested for DNA. Seagle said that she was familiar with the murder scene, that it was not uncommon for the area to have a lot of trash in and around it, and that it was “[c]ertainly” a possibility that the condoms found in the area were completely “unrelated” to the crime. . (RTR, R. 90.) Seagle also said that it “could have been a problem” if they had had the condoms tested for DNA and the result showed Bryant’s DNA. (RTR, R. 91.) Seagle testified that, during closing arguments, they used the State’s failure to test the condoms in arguing reasonable doubt, which they could not have done had the condoms been tested and found to have Bryant’s DNA on them. Seagle said she could not recall whether she and Yarbrough discussed filing an ex parte motion to have the condoms tested.
Yarbrough testified that he was aware of the condoms found at the murder scene, was aware that semen and blood were found on Hollis’s boxer shorts, was aware that semen was found on Hollis’s penis, and was aware that two pairs of underwear were found on Hollis. Yarbrough said that he may have viewed the condoms with the other evidence but that he did not move to preserve the condoms. When asked if he made any “ex parte attempts to determine whether the condoms were exculpatory,” Yarbrough stated that “[w]e were afraid of what the condoms might show. So, no, I did not.” (RTR, R. 134.) Specifically, Yarbrough testified that the defense team “felt that the risk ... was just too great” to test the condoms in the event the DNA on the condoms was Bryant’s because, Yarbrough said,
“our defense was that he wasn’t there. He wasn’t at that location; he was never at that location except for — I don’t remember if it was'moving the body or not. But we just felt that if any of the DNA came back him at that parking lot [the murder scene], that — then we would have no. defense.”
(RTR, R. 177.) Yarbrough further explained:
, “The testing on the condoms was it was either going to come back [Bryant] or not, and if it came back [Bryant], then it would have killed our defense. If it didn’t come back, then. I don’t know — you. know, it could — you know, I don’t know what the jury would have thought of that at that point in time.”
(RTR, R. 195.) When asked specifically what would have happened if the DNA on the condoms had matchéd Hollis’s DNA, Yarbrough said that he did not consider that option, although he admitted it “might have beeri” relevant to the kidnapping aspect of the case. (RTR, R.' 196.) Yar-brough also conceded that if the DNA on the condoms had matched Raymond Mathis’s DNA, it'would have been “very helpful” (RTR, R. 196), and that if it had matched Bert Brantley’s DNA, it “[m]ight” have been'helpful. (RTR, R. 197.)
We agree with the circuit court that counsel’s decision not to hire a DNA expert to test the two used condoms found at the murder scene was an objectively reasonable strategic decision. Yarbrough and Seagle-both testified that having the condoms tested could have potentially been detrimental- to the defense and that they deliberately chose not to test the condoms and, instead, chose to use the State’s failure to test the condoms against the State. “[C]ounsel may reasonably avoid presenting evidence or' defenses for a number of sound reasons that lead him to conclude that the evidence or defense may do more harm than good.” Moore v. State, 659 So.2d 205, 209 (Ala.Crim.App.1994). Bryant failed to present any evidence indicating that counsel’s decision in this regard was not reasonably strategic. In his brief *1154 on return to remand, Bryant argues that counsel could have had the condoms tested ex parte, thereby removing any risk that the State would have learned of the test results had those results been detrimental to Bryant. However, this argument fails to recognize that the condoms were in the State’s possession. Although counsel could have, and in fact did, move for funds for DNA testing ex parte, because the condoms were in possession of the State it would have been impossible to have had the condoms transferred from the State’s possession to an outside laboratory for testing without the State’s knowledge. Once the State was aware of the defense’s testing, the State could have requested discovery of the test results or could have conducted its own DNA testing on the condoms. In either case, if the DNA-test results were harmful, it would have provided the State with more evidence against Bryant. Counsel’s decision not to take that risk was reasonable.
Therefore, the circuit court properly denied this claim of ineffective assistance of counsel.
B.
Bryant also alleged in his first amended petition that Yarbrough and Seagle were ineffective for not properly investigating and presenting evidence to support a motion to suppress the first statement Bryant made to police. Bryant argued in his petition that “[cjounsel failed to present evidence by Sheliah Gayle Bryant McCree[10] that Bryant had asked for an attorney prior to the January 29 police interrogation.” (C. 474.) Specifically, Bryant alleged:
“On the night of January 29, 1997, the night of Bryant’s first interrogation by the Dothan Police Department, he phoned his sister Sheliah Gayle Bryant McCree. Their conversation took place on speakerphone with Sgt. Stanley in the room. Bryant told Sheliah Bryant they were accusing him of capital murder. She advised Bryant to ask for an attorney and not to say anything until he received one. The speaker phone remained on after she and Bryant said goodbye. She then heard Bryant ask for cigarettes and a lawyer. The police told Bryant they would get him a lawyer, but continued the interrogation and told him he needed to ‘answer their questions.’ After approximately thirty seconds, someone realized the speaker was still on, and ended the call. Ms. McCree told Bryant’s attorney what she had overheard. That attorney had to withdraw due to a conflict of interest. Ms. McCree subsequently told court appointed attorneys Mr. Motley and Mr. Yarbrough about the portion of the interrogation that she had overheard. Ms. McCree’s testimony about what she overheard and Sgt. Stanley’s refusal to honor Bryant’s exercise of his right certainly provided grounds for excluding the entirety of Bryant’s January 29, 1997 statement. Without that statement, the State would have had no basis for asserting that Bryant made a comment during the interrogation which the police took as an admission of killing Hollis. (According to Sgt. Stanley, in response to Stanley’s question regarding why Bryant shot Hollis three times and what was on Bryant’s mind, Bryant responded T don’t know, I think I need help.... Sometimes I am just not Jerry.’).
“In addition, during the second interrogation, which was tape-recorded, Bryant consistently asked for a lawyer. The police ignored his requests and con *1155 tinued asking him questions, despite Bryant’s very clear and repeated invocation of his right to counsel.
“In spite of being in possession of such critical information, Mr. Yarbrough failed to move to suppress the first (unrecorded) statement, to call Ms. McCree to testify at the suppression hearing, and to introduce this critical piece of evidence of a constitutional violation under Miranda v. Arizona, 384 U.S. 436 (1966). Subsequently, the motion to suppress the second statement was denied in substantial part (the first 66 pages of the written transcript from the January 30, 1997 interrogation were not suppressed, even though Bryant had requested a lawyer numerous times prior to page 66 of the transcript) and Bryant’s interrogation and statements were admitted at trial through Sgt. Stanley’s testimony. Had Mr. Yar-brough called Ms. McCree to testify, there is a reasonable likelihood that the court would have excluded Bryant’s statements from trial. Ms. Bryant’s testimony would have demonstrated that Bryant sought counsel immediately upon arrest and therefore none of the statements he made were voluntary and freely given.
“Mr. Yarbrough’s failure to provide critical evidence at the suppression hearing prejudiced Bryant because Bryant’s statements were admitted at trial. Mr. Yarbrough’s actions cannot be attributed to reasonable trial strategy.”
(C. 474-76.)
At the evidentiary hearing, Yarbrough testified that he knew Sheliah Bryant, Bryant’s sister, and that she was a witness during Bryant’s trial. Yarbrough said that he did not recall Sheliah ever telling him that she had overheard on speakerphone Bryant asking for a lawyer during his first statement to police. Yarbrough further stated that if he had been provided with that information, he “would have definitely pursued it” by moving to suppress the statement on that ground and requesting a suppression hearing. (RTR, R. 191.) Being familiar with the practices of the Dothan Police Department, however, Yar-brough said that it would have been unusual for the officers to allow anyone to make a telephone call during an interrogation. In fact, Yarbrough said that “[t]hey won’t even let the attorneys call in. There would be nb way that — when they'"get them back in the police department, defendants do not get contact with anyone.” (RTR, R. 190.) Nonetheless, Yarbrough made clear that if he had been “told that by Sheliah, it would not be my — it’s not my job to determine whether or not Sheli-ah is truthful or not” and that he “would have pursued it in a motion to suppress the statement.” (RTR, R. 191.)[11]
Sheliah testified at the hearing that she remembered the day Bryant was taken into custody and that she received a telephone call from Bryant that day. However, contrary to the allegations Bryant made in his petition, Sheliah testified that she did not speak to Bryant that day. Rather, Bryant left a message on her home answering machine. Sheliah said that the message was left on her machine at “about 10:00” p.m. (RTR, R. 323.) She-liah said that her answering machine indicated that she had missed a call “[f]rom *1156 the City of Dothan” and that, when she checked the message on her machine, she heard that it was from Bryant. (RTR, R. 318.) Sheliah said' that she heard Bryant ask for a lawyer and then “heard this other man say something about my Dad.” (RTR, R. 318.) Sheliah also said that she heard the man, whom she later claimed was a “detective,” say “something about a watch.” (RTR, R. 321.) At that point, the message ended. Sheliah said that she did not keep the messáge from that day-because she “didn’t think it was important.” (RTR, R. 321.) :
Although Sheliah indicated that she believed Bryant left the message while he was being interrogated by police, she admitted that h(er belief in this regard was based on speculation. Specifically, the following exchange occurred on cross-examination:-
“[Assistant Attorney General]: But you don’t know exactly what time this was, or you don’t know where he was specifically in jail?
“[Sheliah]:' Yeah. I know where he was. He was at the City becáuse I followed him there.
“[Assistant Attorney General]: You don’t know where he was in the city jail or what he was specifically doing at the time he made the phone call, because it was an answering machine recording. Correct?
. “[Sheliah]: Well, he had to be interrogated.
“[Assistant Attorney General]: You are guessing that.. Right?
“[Sheliah]: Well, I could hear the detectives saying something to him about my dad and about a watch.
“[Assistant Attorney General]: And so you are guessing, based on what you said, that he was being interrogated?
“[Sheliah]: You can say I’m guessing, but that’s had to be what happened. If he was at the County jail, he wouldn’t— wouldn’t nobody be asking him about a watch and my dad.
“[Assistant Attorney General]: So he could have been sitting in his cell making a phone call—
“[Sheliah]: I doubt it — not. Because if he was at the County jail, he would have called me collect. He did not call me collect.
“[Assistant Attorney General]: So basically any time he was in the City jail, he had to have been being interrogated? Is that what you are trying to say?
“[Sheliah]: Yes. I believe they allowed him his phone call, and he called me, and they had him on the answering machine, because I guess they wanted to hear what he was saying or probably hear what I had to say, and they just forgot to disconnect. That’s it. It wasn’t long. They just forgot to disconnect.
“[Assistant Attorney General]: And that’s your guess, your speculation about what happened?
“[Sheliah]: That is true.”
(RTR, R. 324-25.)
Sheliah testified that she had told Blake Green, who Bryant alleged at the hearing was his first attorney before Yarbrough was appointed, about what she had heard on her answering machine. However, Sheliah stated, contrary to the allegation Bryant made in his first amended petition, that she did not inform any of Bryant’s trial attorneys, i.e., Yarbrough, Seagle, or Spencer, about the message she had heard from Bryant. According to Sheliah, she was available and willing to testify at the pretrial suppression hearing, but Yar-brough never asked her to testify. -
*1157 In its order on remand, the circuit court made the following findings regarding this claim:
“Next, [Bryant] alleges that trial counsel at his first trial were ineffective for not properly investigating and presenting evidence to support a motion to suppress the first statement he made to the police. Specifically, [Bryant] alleges that his sister, Sheliah McCree, informed Trial Counsel that she had a telephone conversation with [Bryant] when he was at the Dothan Police Department which was on speaker, and she heard him ask for a lawyer. Mr. Yarbrough testified that he is familiar with the practices of the Dothan Police Department and the interviewing of witnesses and that to allow such a telephone call would not have been consistent with the police department’s practices. . Mr. Yarbrough testified that there is no way the alleged conversation happened [but] if he had been told of it he would have filed a Motion to Suppress [Bryant’s] statement. Mr, Yar-brough cannot be held ineffective for failing to file a Motion to Suppress [Bryant’s] statement in this instance when he was not made aware of [Bryant’s] alleged request for an attorney.”
(RTR, C. 1834-35.) These findings are supported by the record. Based on the testimony at the hearing, it is clear that, contrary to the allegation Bryant made in his first amended petition, Sheliah never told Yarbrough, Seagle, or Spencer about the message she received from Bryant the night he was arrested, and we agree with the circuit court that counsel cannot be held ineffective for not presenting evidence that counsel did not know existed.
Moreover, we point out that Bryant also failed to prove that he actually requested a lawyer during his January 29 interrogation.. Although Bryant alleged in his first amended petition that Sheliah spoke to Bryant while he was being interrogated on January 29, Bryant did not prove that factual allegation at the hearing. To the contrary,. Bryant’s-evidence established that Sheliah did not speak with Bryant during his interrogation the day of his arrest, but merely heard a message on her answering machine from Bryant that she assumed was left while Bryant was being interrogated. Bryant also failed to present any evidence at the hearing indicating that he had left the message on Sheliah’s answering machine before or during the interrogation on the day of his arrest. Sheliah testified only that she speculated that the message was left while Bryant was being interrogated. Indeed, Sheliah testified at the hearing that the message was received at approximately 10:00 p.m.; however, the record from Bryant’s direct appeal reflects that his statement to police- began at 8:15 p.m.
' Under these circumstances, Bryant clearly failed to prove that his counsel’s performance relating to the motion to suppress was deficient or that counsel’s performance prejudiced him in any way. Therefore, the circuit court properly denied this claim.
C.
Finally, Bryant alleged in his first amended petition that trial counsel at his first trial and trial counsel at his second penalty-phase trial were ineffective for not adequately impeaching, Ricky Vickers and that trial counsel at his second penalty-phase trial were ineffective for not adequately challenging Vickers’s unavailability.
1.
In his first amended petition, Bryant alleged that Yarbrough was ineffective for not adequately impeaching Ricky Vickers *1158 at his first trial. Specifically, Bryant alleged:
“Mr. Yarbrough failed to properly impeach State’s witness Ricky Vickers [at his first trial] by: (1) not pointing out the major inconsistencies between prior statements made by Vickers; (2) not adequately exploring what the State offered to Vickers in exchange for his cooperation and testimony; (3) .not revealing Vickers’[s] previous felony convictions; and (4) not pointing out Vick-ers’[s] general lack of character, for truthfulness.
“Vickers gave a statement to Sergeant Jim Stanley on January 30, 1997 and gave another statement to Sergeant David Jay on January 31, 1997. Both these statements differed from each other and from the story that Vickers ultimately told on the stand during Bryant’s original trial.
“For example, at trial, Vickers testified that Bryant drove to the house of a person who Vickers identified at trial as being Raymond Mathis. Vickers said that Bryant and Mathis discussed the sale of the cell phone, following which Mathis carried the phone to ‘some guy in exchange for some dope. In his January 29 and 30, 1997 statements to the police, Vickers never mentioned anything about going to Raymond Mathis’s house or Mathis’s involvement with the cell phone. In fact, in his January 29 and 30 statements, Vickers never mentioned anything about the cell phone (other than Bryant talking on the cell phone) or Bryant selling the cell phone until January 30, when the police asked whether Bryant still had the cell phone when they left the body on the dirt road. In response, Vickers gave varying answers before finally settling on saying that he thought, but could not be sure since he was on drugs, that Bryant had pulled off at a store and given a man standing on the corner at the store the cell phone in exchange for some drugs. In his January 31 statement, Vickers gave yet a different version of the event. Vickers said that Bryant went to Mathis’s house, gave Mathis the cell phone, Mathis gave Bryant directions to the house of a woman, Mathis went into the woman’s house, and when Mathis returned to the car, he no longer had the cell phone but did have some dope. Again, Mr. Yarbrough did not highlight any of these inconsistencies.
“Vickers also testified at trial that Mathis told him and Bryant where they could leave a body; knew there was a body in the car; rode with them and identified the dirt road where they could leave the body, and got out of the car and watched while Vickers and Bryant removed the body from the trunk and placed it on the hill. In his January 29 statement to the police, Vickers never mentioned anything about Mathis’s involvement in moving the body.
“At trial, Vickers testified that he was with Bryant when Bryant parked the car. In his January 30 statement to the police, Vickers outright denied being with Bryant when Bryant parked the car. In that same statement, Vickers also said that he did not, at any time during the night, hold the gun that Bryant allegedly had been holding or possessed during the entire time he was with Vickers. In his January 31 statement, however, Vickers admitted holding the gun.
“Mr. Yarbrough also failed to adequately explore what the State offered to Vickers in exchange for his cooperation and testimony. While Mr. Yarbrough did question Vickers, Mr. Yarbrough’s examination was grossly inadequate. Mr. Yarbrough’s examination of Vickers on this issue *1159 consisted of whether he had been convicted of selling dope and brief questioning regarding whether capital murder charges had been dropped against Vickers in exchange for his testimony. Mr. Yarbrough failed, to question and impeach Vickers using his prior bad acts which would have revealed Vickers[’s] extensive history of drug use and would have emphasized Vickersps] overwhelming incentive to cut a deal with the prosecutor.
“Although the police initially questioned Vickers for murder, the State subsequently reduced the charge to hindering prosecution. The District Attorney’s standard procedure when seeking the cooperation of a witness who had other criminal charges pending was to get the guilty plea prior to the witness’s testimony and then schedule the sentencing hearing for some time after the case in which the witness would testify. Depending on ‘how good’ the prosecutor determined the witness’s testimony to be, the prosecutor would determine the recommended sentence for the witness in his criminal case. The prosecutor followed the same procedure when dealing with Vickers. Trial counsel’s failure to discover and impeach Ricky Vickers’s testimony in this regard could not be considered strategic.
“Mr. Yarbrough also failed to call character witnesses to testify to Vick-erses] character, for truthfulness; residents of the Bottoms neighborhood would have testified that Vickers had an acute drag problem and therefore his statements were unreliable and that he was generally an untruthful person. These character witnesses would have also testified that Vickers was clearly under the influence of drugs during his testimony at trial.
“But for Mr. Yarbrough’s failures described above, there is a reasonable probability that Bryant would have been acquitted or would have avoided a death sentence. Mr. Yarbrough’s deficient performance fell below the objective standard of reasonableness and prejudiced Bryant because Mr. Yarbrough permitted biased and unreliable testimony against Bryant.”
(C. 476-79.)
In its order on remand, the circuit court made the following findings regarding this claim:
“[Bryant] alleges multiple inconsistencies in statements from Mr. Vickers that trial counsel could have used to impeach Mr. Vickers. Mr. Yarbrough testified that he was aware at the time of trial of some damaging information that could be introduced through Mr. Vickers that was not brought out during direct examination by the State. Further, Mr. Yarbrough testified that he used inconsistencies to impeach Mr. Vickers but proceeded cautiously in his cross-examination of Mr. Vickers to prevent the damaging information that he was aware of from being introduced. Lastly, he felt that Mr. Vickers’s testimony on direct was not so helpful to the State. In his [post-hearing] briefs, [Bryant] also discusses trial counsel’s lack of memory as to why he made certain decisions in the cross-examination of Mr. Vickers which occurred approximately fourteen years, ago. Simply because Mr. Yarbrough cannot remember in 2012 specifically why he did or did not cover certain inconsistencies between Mr. Vickers’s statement and his testimony at the trial approximately fourteen years ago, does not have any bearing on whether he was effective. Further, [Bryant’s Rule 32] counsel argues that the problem is not that Mr. *1160 Yarbrough did not impeach Mr. Vickers, but instead that he was ineffective in the way he impeached him and that had he done a better job of impeaching Mr. Vickers, a reasonable probability exists that [Bryant] would not have been convicted or may have avoided a death sentence. Simply because [Bryant’s] Rule 32 counsel sets forth a multitude of ways Mr. Yarbrough could have better impeached Mr. Vickers doesn’t mean Mr. Yarbrough was ineffective. Viewing the alleged deficiencies in Mr. Yar-brough’s performance at the time of the trial rather than in hindsight, the Court finds that Mr. Yarbrough made well informed and reasonable strategic decisions at the time of trial with regard to whether and how to attempt to impeach Mr. Vickers. Accordingly, the Court finds that trial counsel was not ineffective by failing to adequately impeach Mr. Vickers.”
(RTR, C. 1335.) These findings are supported by the record.
Initially, we point out- -that, with respect to Bryant’s allegations that his counsel did not adequately explore what the State offered to Vickers in exchange for his testimony, did not = reveal Vickers’s prior felony convictions, and did not present evidence of Vickers’s reputation for untruthfulness, Bryant did not question Yarbrough, Seagle, or Spencer at the evidentiary hearing regarding these specific matters. “It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim.” Broadnax v. State, 130 So.3d 1232, 1255 (Ala.Crim.App.2013). As already noted, “[i]f the record is silent as to the reasoning behind counsel’s actions, the presumption of effectiveness- is sufficient to deny relief on [an] ineffective assistance of counsel claim.” Id. at 1256 (citations omitted). Moreover, Bryant did not present- at the evidentiary hearing evidence of Vickers’s reputation for untruthfulness that he believed his counsel should have presented at his trial. Simply put, Bryant presented no evidence at the evidentiary hearing regarding these specific allegations. “[A] petitioner is deemed to have abandoned a claim if he fails to present any evidence to support the claim at the evidentiary hearing.” Brooks v. State, 929 So.2d 491, 497 (Ala.Crim.App.2005). See also Jackson v. State, 133 So.3d 420, 436 (Ala.Crim.App.2012) (opinion on return to remand); Burgess v. State, 962 So.2d 272, 300 (Ala.Crim.App.2005) (opinion on application for rehearing); and Payne v. State, 791 So.2d 383, 399 (Ala.Crim.App.1999). Moreover, because Bryant failed to present any evidence of these specific allegations' at the hearing, he necessarily failed to prove that Yarbrough was ineffective for not adequately impeaching Vickers with the deal Vickers had made with the State for his testimony and with Vickers’s-prior felony convictions and for not presenting evidence of Vickers’s reputation for untruthfulness.
With respect to Bryant’s allegation that his counsel did not adequately impeach Vickers with Vickers’s three prior inconsistent statements to police, at the evidentia-ry hearing Yarbrough said that he had reviewed Vickers’s three statements to police before Bryant’s trial but that he could not recall, at the time of evidentiary hearing, the specifics of those statements. However, Yarbrough stated that he had a strategic reason for not cross-examining Vickers about every inconsistency between his" statements and his trial testimony. -Specifically, Yarbrough said:
“We had to be- careful with Vickers, because there were some things that-- he had told our investigator about what had happened, -and we' were tip-toeing around certain things that he had told [the investigator].”
*1161 (RTR, R. 166.) According to Yarbrough, they “had to tiptoe around Vickers in [their] cross-examination of him, because of certain things that [they] knew that [they] may open the door up to.” (RTR, R. 166.) Yarbrough further explained:
“Do I recall specifically why I did not attack Vickers on some inconsistencies that may or may not have been in the police reports? No, I don’t remember that. I do remember, though, that there were some things that we were concerned about — and to tell you today, I do not specifically remember — but that we thought Vickers could hurt us.”
(RTR, R. 167-68.)
Yarbrough also testified that, in addition to trying to avoid bringing out damaging information from Vickers on cross-examination, during his testimony on direct examination by the prosecutor Vickers testified to some information that was not helpful to the prosecution and the prosecutor himself had to impeach Vickers with his prior inconsistent statements, which Yarbrough believed was helpful to the defense.[12] Yarbrough explained:
“I think his testimony, for the most part, was — we felt was going good for us, better than what we had probably expected. There were some things that we were afraid we were going to open the door on, and that’s the reason we took the tactic — or I took the tactic that I did with Vickers.”
(RTR, R. 187.) Overall, with respect to Vickers’s testimony, Yarbrough said that he felt he had “made the points that [he] needed to make.” (RTR, R. 188.)
Bryant argues in his brief on return to remand that the circuit court erred in finding, that Yarbrough’s decision regarding how ,to-cross-examine Vickers regarding his prior inconsistent statements .was a reasonable strategic decision because, he says, the circuit court should not have “credited” Yarbrough’s testimony that the nature and extent of his cross-examination of Vickers was strategically calculated to avoid eliciting information that would have been damaging to Bryant. (Bryant’s RTR brief, p. 96.) Bryant appears to argue that because Yarbrough’was unable to recall, at the' time of the - evidentiary’ hearing, the exact details of each of Vickers’s statements to police and Vickers’s trial testimony, Yarbrough’s testimony that he made a strategic decision regarding the cross-examination of Vickers was vague and conflicted with his otherwise lacking memory and was not sufficient to establish that he had a valid reason for not impeaching Vickers with the specific inconsistencies Bryant alleged, in his .first, amended petition. In other words, Bryant’s argument is based on his belief that Yarbrough’s testimony was not credible. He even goes so far as to argue:in his reply brief on return to remand.that Yarbrough’s explanation for not further impeaching Vickers with his prior inconsistent statements was simply “a pretext.” (Bryant’s RTR reply, brief, p. 31,). . .
However, as noted above, “[t]he credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or' falsity of testimony or on the' credibility of witnesses.” Hope v. *1162 State, 521 So.2d 1383, 1387 (Ala.Crim.App.1988). It is well settled that, in order to be entitled to relief, a postconviction “petitioner must convince the trial judge of the truth of his allegation and the judge must ‘believe’ the testimony.” Summers v. State, 366 So.2d 336, 343 (Ala.Crim.App.1978). See also Seibert v. State, 343 So.2d 788, 790 (Ala.1977). Bryant made the same argument regarding Yarbrough’s credibility in his post-hearing brief in the circuit court, and the circuit court specifically rejected the argument, finding that Yarbrough’s lack of memory regarding specific details some 14 years after Bryant’s trial was not relevant in determining whether Yarbrough’s actions at the time of trial constituted deficient performance. In other words, the circuit court found Yarbrough’s testimony to be credible and, after thoroughly reviewing the record, we see no reason to disturb that finding on appeal.
“‘The method and scope of cross-examination “is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel.” ’ ” Davis v. State, 44 So.3d 1118, 1135 (Ala.Crim.App.2009) (quoting State ex rel. Daniel v. Legursky, 195 W.Va. 314, 328, 465 S.E.2d 416, 430 (1995)). “ ‘ “[DJecisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature.” ’ ” Hunt v. State, 940 So.2d 1041, 1065 (Ala.Crim.App.2005) (quoting Rosario-Dominguez v. United States, 353 F.Supp.2d 500, 515 (S.D.N.Y.2005), quoting in turn, United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir.1987)). Moreover, what “[s]ubjects [are] covered during cross-examination are generally matters of trial strategy and left to the judgment of counsel.” State v. Mahoney, 165 S.W.3d 563, 568 (Mo.Ct.App.2005). Yarbrough’s decision regarding how to cross-examine and impeach Vickers was reasonable and strategically calculated to avoid eliciting or opening the door for the admission of damaging information about Bryant that was within Vickers’s knowledge. Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.
2.
In his first amended petition, Bryant also alleged that his trial counsel at his second penalty-phase trial was ineffective for not adequately impeaching Vickers by introducing evidence of his prior statements to police. Specifically, Bryant alleged:
“Resentencing counsel was also ineffective by not impeaching Vickers’s trial testimony with prior inconsistent statements made by Vickers on several other occasions, including statements made to police on January 29 and 30, 1997. Re-sentencing counsel only focused on Vickers’s prior convictions to impeach Vickers; this was not effective because Vickers’s previous convictions were revealed during his transcript testimony. (R. 386-395 Remand.) In fact, the State did not even object to the introduction of an additional conviction because he didn’t think the admission of additional convictions would ‘make a big difference anyway.’ (R. 392-95 Remand.) Resentencing counsel acted ineffectively because he did not offer Vickers’[s] prior inconsistent statements to police that demonstrate that Vickers clearly changed his story on a number of occasions. (A full description of Vickers’[s] inconsistent statements is located at [paragraphs] 91 to 93, supra [as quoted above in Part III.C.l. of this opinion]).”
(C. 483.)
In its order on second remand, the circuit court stated, in relevant part, the following regarding this claim:
*1163 “ ‘When reviewing claims of ineffective assistance of counsel during the penalty phase of a capital trial we apply the following legal standards.
““‘When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is ‘a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence— would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.”
“‘In Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court in reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:
“ ‘ “In Strickland v. Washington, 466 U.S. 668 (1984), we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.’”
“Davis v. State, 44 So.3d 1118, 11[37] (Ala.Crim.App.2009) (citations omitted).
[[Image here]]
“The testimony given by Mr. Crespi at the Rule 32 - hearing with regard to the allegations of ineffective assistance of counsel based on his failure to impeach the prior testimony of Mr. Vickers by use of his alleged inconsistent statements to the police officers is summarized as follows: Mr. Crespi testified that he was aware that Mr. Vickers gave three statements to at least two different police officers over the course of three days; to wit: January 29, 1997, January 30 1997, and January 31, 1997. Further, he believes that he was in possession of each of the three statements at the time of the second penalty phase [trial]. He had assessed the importance of Vickers’s testimony to the State’s case prior to beginning the resenténcing trial; specifically, Vickers alleged involvement in getting the body of the deceased put in the car and moved to Florida, the alleged sale of the cell phone, and the events Vickers claimed happened in Tallahassee culminating in the return to Dothan from the Live Oak area of Florida, all of which the State alleged showed an intentional killing for pecuniary gain as an aggravating circumstance. Also, Mr. Crespi testified of his intent to cross-examine Vickers regarding the sale of the cell phone and other issues that he testified about regarding pecuniary gain had Vickers been present. He further testified that he did not attempt to offer Vickers’s statements to the police to impeach Vickers’s testimony because the thought of doing so did not occur to him and not doing so was not part of any strategy. However, he did offer the felony convictions of Vickers for impeachment of Vickers’s testimony from the first trial.
“It is the duty of the Court to analyze counsel’s performance at- the time of representation' and not with hindsight. Almost invariably, an attorney will analyze his own performance in any trial and second guess whether -he should have done something differently, especially if the outcome is not favorable. It is even easier to second guess -someone else’s actions and decisions. Although [Bryant’s Rule 32] attorneys *1164 have alleged that Mr. Orespi was ineffective for not impeaching Mr. Vickers’s testimony with the inconsistent statements that he.gave to the police officers, they did not ask . Mr. Crespi any questions regarding any of the specific inconsistent statements that they contend should have [been] used to impeach Mr. Vickers’s testimony. Yet, in their briefs , in support of the Rule 32 Petition they allege several inconsistencies that they believe should have been introduced into evidence to impeach Mr. Vickers’s testimony. The Court finds that Bryant’s attorney at the second penalty phase [trial] impeached Vickers with felony convictions but did not attempt to elicit testimony from police officers regarding Mr. Vickers’s prior, inconsistent statements. The Court reviewed the alleged inconsistencies in Mr. Vickers’s statements to the police officers set forth in [Bryant’s] Petition,.which [Bryant’s] attorneys did not' specifically address with Mr. Cres-pi. The Court finds that even if Mr. Vickers’s alleged inconsistent statements had been presented to the jury, the jury may still have found that Petitioner killed the victim and disposed of the cell phone for pecuniary gain and that such aggravating circumstances outweighed any mitigating circumstances, warranting a sentence of death. Therefore, the Court " finds ' that [Bryant] has failed to demonstrate ‘a reasonable probability that, absent the [alleged] errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’ Davis v. State, 44 So.3d [1118, 1137 (Ala.Crim.App.2009)], citing Striekland v. Washington. Furthermore, as the jury’s verdict was an advisory vérdict, the trial judge, the Honorable Edward Jackson, determined the sentence to be imposed pursuant to Ala.Code § 13A-5-47. The Court finds that, even if Mr. Vickers’s inconsistent statements had been presented and .the jury [had] returned an advisory verdict-of life without parole, a reasonable probability exists. that Judge Jackson may have found that the aggravating circumstances outweighed the mitigating circumstances and may have entered a sentence of death-.. Accordingly, the-.Court finds [that Bryant] has failed to show that the -result of the penalty phase would have been different ... i.e., the jury would have rendered an advisory verdict of life without parole and the trial court also would have entered a sentence of life without parole.
“In conclusion, the Court finds that trial counsel at his second penalty phase trial was not ineffective for failing to adequately impeach Ricky Viekers’s testimony by not introducing into evidence at the second penalty phase trial several prior statements Vickers had made to police that were inconsistent with his trial testimony.”
(Record on Return to Second Remand (“RTR2”), C. 6-8.)
In his brief on.return to second-remand, Bryant argues, that the circuit court used an incorrect standard in analyzing this claim of ineffective assistance .of counsel. Specifically, Bryant takes issue with the circuit court’s statements that “the jury may still have found” that the murder was for pecuniary gain and that the aggravating circumstances outweighed the mitigating circumstances,, that even had the jury recommended a sentence of life imprisonment without the possibility of parole the trial judge “may have found that the aggravating circumstances outweighed the mitigating circumstances and may have entered a sentence, of death,” and that Bryant failed to prove that “the result of *1165 the penalty phase would have been different .., i.e., the jury would have rendered an advisory verdict of life without parole and the trial court also would have entered a sentence of life without parole.” (RTR2, C. 8.) The burden imposed by the circuit court, Bryant argues, was much higher than the “reasonable probability” test enunciated in Strickland and requires that the circuit court reconsider this claim a third time. We disagree.
In its order, the circuit court correctly set forth the standard under Strickland for evaluating claims of ineffective assistance of counsel relating to the penalty phase of a capital trial — whether there is a reasonable probability that, absent the errors, the sentencer, including the appellate court, would have concluded that the balance of aggravating .and mitigating circumstances did not warrant death. Additionally, there is a.prqsumption that circuit judges, know the law and follow it in making their decisions. See Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (“Tidal judges are presumed to follow their own instructions, and they are presumed to know the law and to follow it in making their decisions.”). Although the circuit court’s order contains imprecise language and is not artfully worded, it is clear to us from reading the order as a whole that the circuit court knew the correct standard for analyzing ineffective-assistance-of-counsel claims and applied that standard in determining that counsel’s performance did not prejudice Bryant.
Moreover, we agree with the circuit court that counsel’s failure to introduce evidence of Vickers’s prior inconsistent statements to police did not prejudice Bryant.[13] The jury was well aware that Vickers had multiple prior felony convictions and that he had initially been árrgst-ed for capital murder in connection with Hollis’s death but that the charge had been reduced to hindering prosecution in exchange for Vickers’s cooperation. In other words, the jury knew that Vickers had a strong incentive to lie — specifically, to minimize his role in Hollis’s murder and to maximize Bryant’s role in Hollis’s murder. We have thoroughly reviewed the record of the second penalty-phase trial as well as Vickers’s three statements to police, which were introduced into evidence at the Rule 32 hearing. Although there were several inconsistencies among the three statements as well as between the statements and Vickers’s trial testimony, those inconsistencies are not nearly as stark as Bryant makes them out.to be, and many of those inconsistencies were highlighted during Vickers’s testimony, Even had the. three prior inconsistent statements been presented to the jury, in their entirety, we are convinced beyond a doubt that there is no reasonable probability that “the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Strickland, 466 U.S. at 695. Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.
3.
Finally, Bryant alleged in his first amended petition that his trial counsel at his second penalty-phase trial was ineffective for not adequately contesting Vick-ers’s unavailability with counsel’s own knowledge of Vickers’s whereabouts. Specifically, Bryant alleged:
“Resentencing counsel failed to effectively challenge the State’s proffer of *1166 Ricky Vickers’s trial transcript instead of live testimony because Ricky Vickers was ‘unavailable’ to testify under Ala. R. Evid. 804(a)(5). (R. 11-19; R. 316-18 Remand.) The Alabama Supreme Court stated in Ex parte Scroggins, 727 So.2d 131 (Ala.1998), that the prosecution must make ‘a good faith effort to obtain the presence of the declarant at trial’ in order to offer the statement of a witness who is not present at trial and satisfy the right of confrontation. The State must exercise due diligence in its attempt to procure the presence of a witness. Johnson v. State, 623 So.2d 444 (Ala.Crim.App.1993). The court imposes a high standard for proving that such due diligence took place. The party seeking to introduce the declarant’s statement has to show that it is unable to procure the declarant’s attendance either by legal process or by other reasonable means. Williams v. Calloway, 281 Ala. 249, 251-52, 201 So.2d 506, 508 (Ala.1967).
“Resentencing counsel was ineffective for failing to demonstrate to the Court that the State did not exercise due diligence in its search for Ricky Vickers. On the first day of [the second penalty-phase] trial, the State indicated that it would be offering the transcript of Vick-ers’s prior trial testimony because Vick-ers could not be located during the previous weekend. (R. 11-12 Remand.) Resentencing counsel never pointed out that the State did not exercise due diligence in procuring Vickers for trial. Resentencing counsel failed to point out that the ‘Bottoms’, the neighborhood where Vickers resided, spans just a couple of streets and thus it would have been very easy for the Houston County Sheriffs Office to canvass the neighborhood in search of Vickers. Resentenc-ing counsel did not argue that the State had failed to meet the due diligence standard by questioning only those people closest to Vickers, who had strong motives to keep his whereabouts secret.
“In fact, resentencing counsel was aware of Vickers’s whereabouts and knew of individuals who could testify to Vickers’s location. In fact, in a recent interview with Vickers, he stated that he remembers being in the Bottoms and that he was accessible at the time that Bryant’s resentencing hearing occurred. This alone, establishes the fact that the State did not exercise due diligence in attempting to procure Vickers for trial. Resentencing counsel were ineffective because they should have requested a recess to procure witnesses, including Vickers himself, to testify to Vickers’s whereabouts and demonstrate that the State did not exercise due diligence in its search for Vickers.
“While resentencing counsel did not bear the burden of producing Vickers for trial, resentencing counsel did have the responsibility to demonstrate that the State’s search for Vickers fell below the standard of due diligence. Resen-tencing counsel was ineffective because they did not challenge whether the State had met its burden to show that Vickers was ‘unavailable’ when the facts clearly demonstrated that Vickers was available to testify. This failure is particularly acute because Vickers’s hearsay testimony is the only evidence linking Bryant to the alleged sale of Hollis’s cell phone. The sale of the cell phone is one of only two aggravating factors on which the State relied in seeking the death penalty. Removal of Vickers’s hearsay testimony was crucial to Bryant’s defense.”
(C. 481-83.)
Initially, we point out that Bryant’s general allegations in his amended petition that counsel at his second penalty-phase trial, Michael Crespi, “never pointed out that the State did not exercise due dili *1167 gence in procuring Vickers for trial” and “did not challenge whether the State had met its burden to show that Vickers was ‘unavailable’” are belied by the record from the transcript of Bryant’s second penalty-phase trial. Crespi did, in fact, strenuously object to the State’s using Vickers’s previous trial testimony against Bryant, and he argued that the State had not adequately established that Vickers was unavailable. The issue of Vickers’s unavailability was thoroughly litigated just before the second penalty-phase trial began and was decided adversely to Bryant by the trial- court. Also, the issue was argued on appeal and rejected by this Court. Specifically, this Court held:
“The State offered the following facts in support of its claim that it had exercised due diligence in attempting to secure the attendance of Ricky Vickers to testify at Bryant’s new sentencing hearing: Upon contacting the Department of Corrections (‘DOC’) to secure Vickers’s attendance, the prosecution was informed that Vickers had completed his sentence and that he was no longer in the custody of DOC. The prosecution also contacted the Board of Pardons and Paroles to see if it had an address for Vickers, but was told that Vickers had completed his sentence and was no longer required to report to it. An investigator was sent out to question Vickers’s family members about his location. When questioned about Vickers’s whereabouts, various members of Vickers’s family advised the investigator that they did not know where he was. Some speculated that Vickers might be at his girlfriend’s house, but were either unwilling or unable to supply the State with a name or address for the girlfriend. When Vickers’s grandmother told investigators that he might ‘come by,’ the State issued a subpoena for Vickers ‘in care of his grandmother’s house,’ and had a Houston County sheriffs deputy spend three days attempting to locate and serve Vickers with the subpoena.
“Given these circumstances, we conclude that the State proved that it used due diligence in an attempt to secure the attendance of Ricky Vickers. The State did ‘more than simply issue a subpoena and stop when it [was] returned “not found.” ’ Flowers v. State, 799 So.2d [966,] 980 [ (Ala.Crim.App.1999) ] (opinion on return to remand) (quoting Manuel v. State, 803 P.2d 714, 716 (Okla.Crim.App.1990)). We know of no prescribed period of time that the State is required to search for a witness in order to have exercised ‘due diligence.’ Certainly, some individuals will be easier to find than others. As a convicted felon and acquaintance of Bryant’s, Vickers obviously had no desire .to be found by the State’s investigator or by a sheriffs deputy. If located, he would be required to testify against Bryant. ‘ “ ‘Rule 804(a)(5) does not require a proponent to butt his head against a wall just to see how much it hurts.’ ” ’ Flowers v. State, 799 So.2d at 980 (opinion on return to remand) (quoting Urbano v. State, 808 S.W.2d 519, 522 (Tex.App.1991), quoting in turn, United States v. Kehm, 799 F.2d 354, 360 (7th Cir.1986)). The State having exhausted all leads and expended considerable resources in its attempt to locate Vickers, we cannot say that the trial court abused its discretion when it determined that Vickers was an ‘unavailable witness’ and permitted the State to read Vickers’s previous testimony into the record at Bryant’s new sentencing hearing.”
Bryant III, 951 So.2d at 743.
Therefore, contrary to Bryant’s belief, this Court did not remand this case to allow Bryant an opportunity to generally relitigate the issue of Vickers’s unavailability. Rather, this Court found this specific claim to be sufficiently pleaded because it was “based on additional evidence that *1168 [Bryant] claimed was not, but.should have been, presented to the trial court and this Court regarding Vickers’s unavailability.” Bryant IV, 181 So.3d at 1116 (some emphasis added). The only additional evidence that Bryant alleged in his first amended petition was known to counsel but not presented to the trial court was that Crespi was aware of Vickers’s specific whereabouts at the time of the second p.enalty-phase trial and also knew of specific individuals who could testify to Vickers’s whereabouts, including Vickers , himself, and that Crespi should have requested a continuance so that he could present the testimony of those witnesses.[14]
However, Bryant does not even mention this specific allegation in his brief on return to remand, much less make any argument regarding it.[15] It is well settled that this Court “will not review issues not listed and argued in brief.” Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995). “ ‘[A]llegations ... not expressly argued on ... appeal ... are deemed by us to be abandoned.’ ” Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991) (quoting United States v. Burroughs, 650 F.2d 595, 598 (5th Cir.1981)). Because Bryant chose not to pursue this allegátion in his brief on return to remand, it is deemed to be abandoned.'
Nonetheless, out of an abundance of caution, we also note that this specific allegation is meritless based on the evidence presented at the., evidentiary hearing. Contrary to the allegation Bryant made in his first amended petition, Crespi testified that he did not know Vickers’s, location at the time of the second penalty-phase trial. Additionally, Vickers testified at the hearing that he never spoke with Bryant’s attorneys in 2004 and, therefore, they could not have known his location at that time. As noted in Part II.A. of this opinion, we remanded-this case to give Bryant-an opportunity to present evidence to prove the specific facts he had alleged in ■ his first amended petition. Bryant failed to do so; he failed to-prove that Crespi knew Vick-ers’s whereabouts at the time of the second penalty-phase trial. After thoroughly reviewing the Rule 32 record as well as the record of Bryant’s second penalty-phase trial, we agree with the circuit court that counsel’s performance in this regard was not deficient: Therefore, the circuit court properly- denied Bryant relief on this claim of ineffective assistance of counsel.

Conclusion

Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WINDOM,:P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. Because Bryant's amended petition included all the claims from his original petition, the circuit court’s order addressed the claims as found in the amended petition.

. We note that Bryant argues in his reply brief that if the pleading requirements of Rule 32 are as stringent as explained' above then those requirements are fundamentally unfair, arbitrary, and deny him due process. However, "an appellant may not raise a new issue for the first time in a reply brief.” Woods v. State, 845 So.2d 843, 846 (Ala.Crim.App.2002). "As a general rule, issues raised for the first time in a reply brief are not properly subject to appellate review.” Ex parte Powell, 796 So.2d 434, 436 (Ala.2001). Because this issue was not raised in the circuit court or in Bryant's initial brief but was raised for the first time in Bryant's reply brief, it is not properly before this Court for review and will not be considered.

. Although we find it unnecessary to reach the merits of the claims the circuit court addressed, this does not alter the circuit court’s ability to summarily dismiss a Rule 32 petition on the merits.

. The records from Bryant's direct appeals reflect that Bryant was represented at his first trial by Derek Yarbrough, Deborah Seagle, and Gene Spencer. On' his first appeal, Bryant was represented by Michael Crespi, Deanna Higginbotham, and John Byrd. At his second penalty-phase trial, Bryant was represented by Michael Crespi and John Byrd. On appeal from the second penalty-phase trial, Bryant was represented by Michael Cresprand Deanna Higginbotham. See Hull v. State, 607 So.2d 369, 371 (Ala.Crim.App.1992) (noting that this court may take judicial notice of its own records).

. Although this was not the reason for the circuit court’s summary' dismissal of this claim — the circuit court dismissed the claim as meritless — we may nonetheless affirm the circuit court’s judgment on this ground. See McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007).

. In his original petition, Bryant split this claim into two separate claims — one relating to trial counsel at his first trial and one relating to trial counsel at his second penalty-phase trial. In his amended petition, Bryant merged the two into a single claim, and we address it as such.

.Although in making his argument on appeal Bryant refers in his brief to paragraphs 64-77 of his amended petition, .he makes only the above three arguments on appeal. Those three arguments are contained in paragraphs 66-71 of the amended petition. Paragraphs 64 and 65 are introductory paragraphs setting forth law and do not contain separate claims of ineffective assistance of counsel. Paragraphs 72-77 in the amended petition include additional claims regarding counsel’s alleged failure to investigate other possible leads besides the three Biyant argues on appeal, but Bryant makes no argument in his brief on appeal about those claims. See Part II.G. of this opinion.

8. Bryant raised two Brady claims in his .petition. He does not pursue on appeal the first claim — that the State violated Brady by not producing Ricky Vickers as a witness for the second penalty-phase trial. Therefore, that claim is deemed abandoned and. will not be considered by this Court. See, e.g., Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim.App.1995) (“We will not review issues not listed and argued in brief.”).

. We note that Bryant malees a much more extensive argument regarding this claim in his brief on appeal — spanning some 15 pages — than he did in his amended petition, and he includes detailed factual allegations in his brief. However, because the factual allegations and arguments Bryant includes in his brief on appeal were not included in his petition or amended petition, they are not properly before this Court and will not be considered. See Bearden v. State, 825 So.2d 868 (Ala.Crim.App.2001).

. We note that, contrary to Bryant's assertion in his petition, whether the State destroyed or lost evidence is a separate and distinct issue from whether the State suppressed evidence. The key issue in a Brady claim is whether the defense was aware of the existence of the evidence, not whether the evidence had been destroyed.

. We note that, again, Bryant includes more specific facts in his brief on appeal than he did in his amended petition. However, because those facts were not included in his amended petition, they- are not properly before this Court and will not be considered in evaluating this claim. See Bearden v. State, 825 So.2d 868 (Ala.Crim.App.2001).

. We note that, in its order, the circuit court phrased the question as follows: "Does anyone, either themselves, or a close family member, or a good friend, .work in law enforcement?” (C. 761.) However, that is not the question Bryant alleged in his amended petition was not answered truthfully, and we will not look beyond Bryant’s actual pleadings in order to create a cláim.

. Although this was not the reason for the circuit court’s dismissal of this claim — the circuit court found the claim to be insufficiently pleaded — we may nonetheless affirm the circuit court’s judgment on this ground. See, e.g., McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007).

. We note that Bryant does’not pursue in his brief on appeal the final claim in his amended petition that the cumulative effect of all the claims in his petition entitled him to' a new trial. Therefore,. that, claim is deemed abandoned and will-not be considered by this Court. See, e.g., Brownlee v. State, 666 So.2d 91 (Ala.Crim.App.1995).

. Because the circuit court must reconsider Bryant's discovery request on remand, we pretermit discussion of Bryant’s claim on appeal that the circuit court erred in denying him discovery pending the circuit court's return tp our remand.

. As the Alabama Supreme Court noted in Ex parte Beckworth:
“The fact that the elements of a claim of 'newly discovered material facts' as contemplated by Rule 32.1(e) ... need not be pleaded in order to avoid summary dismissal for failure to state a claim based on Rule 32.1(a) ... does not mean that the preclu-sive bars of Rule 32.2(a)(3) and (a)(5) might not be applicable.”
— So.3d at -.

. Indeed, trial counsel's failure to have the condoms tested for DNA formed the basis of one of Bryant’s ineffective-assistance-of-counsel claims for which we remanded this case for further proceedings. See Part III.A. of this opinion.

. Indeed, had the claims not been so narrow and specific, this Court would have found them to be insufficiently pleaded as we did with the majority of the claims in Bryant's first amended petition.

. Bryant’s argument in this regard is somewhat disingenuous given that he also argues on return to remand that he did, in fact, prove all of his claims of ineffective assistance of counsel so as to entitle him to postconviction relief. As the Pennsylvania Supreme Court noted in a similar situation: "Given Appellant’s strenuous argument that he has proven his right to collateral relief, we find his current claim, that the order denying discovery significantly hampered his ability to conduct a reasonable investigation and to prepare, for the [postconviction] hearing, to be somewhat disjointed. It cannot be that one has proven his/her claim; yet also be true that the inability to obtain discovery on that precise claim resulted in a denial of one’s right to prove that claim." Commonwealth v. Abu-Jamal, 553 Pa. 485, 511 n. 14, 720 A.2d 79, 91 n. 14 (1998).

. Some categories included multiple items of evidence, such as "items collected from location of body,” which included 17 different items of evidence, (RTR, C. 740.) Other categories included only one item of evidence.

. In his brief on return to remand, Bryant appears to argue that the circuit court's findings were not sufficiently specific because they did not include a detailed recitation of every áspect of counsel’s investigation. However, the court’s findings are sufficient to comply with Rule 32.9(d), Ala. R.Crim. P.

. Because we agree with the circuit court’s finding as to the performance prong of Strickland, we need ,not address the prejudice prong of Strickland, Likewise, we need not address Bryant’s argument in his brief on return to remand that the circuit court ap *1146 plied the wrong standard when evaluating the prejudice prong of Strickland.

. Most of the testimony Rule 32 counsel elicited from Bevel at the evidentiary hearing was . geared toward establishing that Bevel was , unable to perform a crime-scene or blood-spatter analysis because of the circuit court’s denial of Bryant’s postconviction discovery requests.

. We note that this assertion is not entirely accurate. There was one other piece of physical evidence linking Biyant to Hollis: the key to Hollis's vehicle; which was found in Bryant's possession at-the time of his arrest.

10. At the evidentiary hearing, Sheliah was identified as Sheliah Gail Bryant.

. We note that Yarbrough’s testimony in this regard occurred on cross-examination by the assistant attorney general. Bryant failed to question Yarbrough on direct examination about this claim, and on redirect examination Bryant asked only a single question about Yarbrough’s “certainty” about what he would have done, at which point Yarbrough reiterated that “as a defense attorney ... if I was told that, I would have pursued that.” (RTR, R. 192.)

. This testimony is supported by the record from Bryant’s direct appeal, which reflects that Vickers was less than forthcoming during direct examination by the prosecutor, so much so that the trial court declared Vickers an adverse/hostile witness and allowed the prosecutor to use leading questions, over defense counsel’s' objection. The prosecutor , also impeached Vickers with Vickers’s prior inconsistent statements to police, and defense counsel used the State's impeachment of its own witness to argue that Vickers was not credible.

. Because wé conclude that Bryant' was not prejudiced, we need not specifically address whether counsel's performance was deficient.

. Bryant also alleged in his first amended petition that his counsel should have made additional arguments to the trial' court in support of his objection. Specifically, Bryant alleged that Crespi should have argued that the neighborhood where Vickers lived, known as the "Bottoms," was small and could have easily been canvassed by law enforcement and that the State should have contacted people other than Vickers's family members in their attempts to locate him. Suffice it to say, after thoroughly reviewing the record from the second penalty-phase trial, we conclude that these additional arguments would not have made any difference in the' trial court's, and subsequently this Court's, conclusion that the State had exercised due diligence in its attempts to locate Vickers.

. Rather, Bryant makes all new arguments on appeal regarding this claim of ineffective ' assistance of counsel — new arguments based on factual assertions that were not included in Bryant’s first' ¿mended petition and, thus, for the reasons stated in Part II.A. of this opinion, are not properly before this Court for review and will not be considered.